300000588

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 1 0 2022

CLERK, U.S. DISTRICT COURT
By_____
Deputy

WONGU ANN,                           §
      Plaintiff,              §
                                    §
v.                                   §
                                    §   CIVIL ACTION NO. _____
LONE STAR FUND IV (US), L.P.;        §
LONE STAR GLOBAL                     §
ACQUISITIONS, LTD.; and JOHN P.      §   **3 -2 2 C V - 1 7 3 4 N**
GRAYKEN,                             §
      Defendants.             §

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff Wongu Ann ("Plaintiff" or "Ann"), as and for his Complaint against Defendants Lone Star Fund IV (US), L.P., Lone Star Global Acquisitions, Ltd. and John P. Grayken (collectively, "Defendants," "Lone Star" or "Lone Star Funds"), states and alleges as follows:

## NATURE OF THE ACTION

1.  This is a diversity action for a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rules of Civil Procedure ("Fed.R.Civ.P.") Rule 57 to determine and resolve an actual controversy spanning over a decade between Lone Star and the Republic of Korea ("South Korea").

2.  As more fully set forth below, the controversy at issue in this action stems from the acquisition of a South Korean bank by Defendants. Plaintiff alleges the acquisition in 2003 was in breach of laws and regulations of South Korea because

Defendants deceived the South Korean financial regulators by making fraudulent misrepresentations concerning the sources of the foreign capital to be used for the acquisition, or the dissimulation of true ownership of, or ultimate investors in the bank, when Defendants sought and successfully obtained the approval of the acquisition from the regulators—which had the authority to assess the fitness of the buyer of the bank.

3.      Accordingly, in this declaratory judgment action, Plaintiff seeks a declaration that as opposed to its representation to the South Korean regulators in its request for the acquisition of Korea Exchange Bank ("KEB") in September 2003 that it would become a sole majority shareholder of the bank as a result of the regulators' approval of the requested acquisition, Lone Star Funds provided only less than 60 % of the total acquisition funds out of its own funds, and Lone Star managed or ran shell nominee investment vehicles in Bermuda for other independent or non-Lone Star investors, who provided the remaining portion of the acquisition funds used to acquire a 51% stake in KEB through LSF-KEB Holdings, SCA (Belgium) ("LSF-KEB"). Plaintiff further seeks a declaration that during the course of approving Lone Star's acquisition of KEB in September 2003, the South Korean regulators was provided by Lone Star with no information about other non-Lone Star investors in KEB other than Lone Star's representation to them that Lone Star would become a sole majority shareholder of KEB.

4.      In addition, Plaintiff may seek to amend this original Complaint in order to claim monetary damages against Defendants if a situation arises where Defendants unlawfully, unduly or improperly delay or hamper the resolution of this case.

## PARTIES AND RELEVANT NON-PARTY

5.      Ann is a citizen of, and a taxpayer in South Korea, residing at 72 Iryeoung-ro 376beon-gil, Jangheung-myeon, Yangju-si, Gyeonggi-do, South Korea. Ann is a civic activist, who has been involved in foundations of various civic movement organizations in South Korea, such as 'Showmethemoney' and 'Plan DAS Dog,' which act as a watchdog monitoring and publicizing wrongdoings in the public sector mainly related to illicit or improper management of public funds (together with Ann and members of said organizations, collectively "Ann's Organizations"). This action is important for South Korean taxpayers, including Ann, as the result of this action bearing directly on the international arbitration proceedings, explained in detail below, at issue in this case, or a recognition and enforcement in South Korea of any award therefrom, will have an enormous impact on them because such award in a huge amount up to U$ 4.68 billion should be paid off with the tax money they pay.

6.      Defendant Lone Star Fund IV (U.S.), L.P. is a limited partnership organized and existing under and by the laws of the State of Delaware, with its principal place of business in Dallas, Texas.

7.      Defendant Lone Star Global Acquisitions, Ltd. is a Dallas-based private equity firm, registered with the U.S. Securities and Exchange Commission, advising Lone Star Funds.

8.      Defendant John P. Grayken ("Grayken") is the founder and Chairman of Lone Star, and has been, at all times material hereto, responsible for developing,

instituting, managing and coordinating all aspects of Lone Star's investment in KEB, which LSF-KEB acquired in 2003. On the occasion of a trial in connection with Lone Star's investment in KEB, held in South Korea in 2008, Grayken testified in the trial on behalf of Lone Star.

9.      Non-party LSF-KEB is a private limited liability company organized and existing under and by the laws of Belgium. No relief is sought herein against LSF-KEB. LSF-KEB is included in this Complaint primarily to present factual allegations.

## JURISDICTION AND VENUE

10.      The Court has jurisdiction over this matter and the parties pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.00 exclusive of costs because the value of consequences which may result from this action, exceeds such jurisdictional amount.

11.      This Court has personal jurisdiction over Defendants because Defendants are present in Texas doing business with their principle place of business at 2711 North Haskell Avenue, Suite 1700, Dallas, Texas, thereby subjecting themselves to the jurisdiction of this Court. At all times relevant to this case, Lone Star's primary management center has been in the State of Texas.

12.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants' principal place of business is in this judicial district.

13.      The declaratory judgment sought in this case pursuant to 28 U.S.C. § 2201 is appropriate because declaratory relief will resolve a definite and concrete controversy,

touching on "the rights and other legal relations" of parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

## FACTUAL ALLEGATIONS

14.     Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

### A Decade-Long Dispute Between Lone Star And South Korea

15.     On or about November 21, 2012, seeking US 4.68 billion in compensation, Lone Star filed an arbitration claim against the South Korean government at the International Center for Settlement of Investment Dispute ("ICSID"), an international arbitration organization, arguing that the South Korean government violated the South Korea-Belgium-Luxembourg Investment Agreement (the "BIT"). [1] Lone Star has contended that as its Belgium and Luxembourg affiliates which acquired KEB in 2003 are "investors" under the BIT, they are entitled to the protection afforded investors in the treaty.

16.     In the arbitration proceedings before the ICSID panel, as its primary claim, Lone Star accuses the South Korean government of having engaged in a continuing pattern of arbitrary and discriminatory conduct impairing the former's ability to dispose its investment in KEB. More specifically, Lone Star claims that it ended up selling off its controlling stake in KEB to Hana Financial Group in 2012 for a margin much smaller than what it could have gained from its 2007 plan to sell the same to HSBC that fell

---

[1] The full name of the BIT, in force since March 27, 2011, is Agreement between the Government of the Republic of Korea and the Belgium-Luxembourg Economic Union for the Reciprocal Promotion and Protection of Investments.

through because the South Korean financial regulatory authorities unreasonably delayed the approval of the sale of KEB shares. Lone Star also accuses that the South Korean government pressured it into lowering the selling price and imposed unfair taxes on its deal with Hana Financial Group.

17.     On June 29, 2022, the Ministry of Justice of South Korea announced that the ICSID Tribunal declared an end to all proceedings before the tribunal regarding the dispute between South Korea and Lone Star, and that the tribunal is scheduled to make a final ruling on the decade-long dispute as early as in 120 days, taking up to 180 days if special review is required.

### Lone Star's Fraudulent Misrepresentations To The South Korean Regulators

18.     On or about September 27, 2003, the Financial Supervisory Commission of South Korea ("FSC") approved Lone Star's acquisition of a 51 percent share of KEB for approximately U$ 1.2 billion, relying on Lone Star's representation to it that Lone Star would be a sole majority shareholder of KEB. The FSC announced such approval in a press release in Korean language, dated September 27, 2003, which is attached hereto as Exhibit A. The diagram depicting Lone Star's proposed ownership or investment structure for its take-over of KEB—that several South Korean news papers reported Lone Star submitted to the South Korean regulators at the time of its request for the acquisition—is attached hereto as Exhibit B ("Lone Star's Investment Structure").

19.     Prior to the FSC's approval, Lone Star claimed that Lone Star was the only potential buyer willing to meet the demands of the KEB shareholders.[2] However, contrary to Lone Star's assertion and its representation to the FSC, as set forth in the following paragraphs, Lone Star was just one of the ultimate investors in KEB or LSF-KEB. In short, the investment plan actually implemented for the take-over of KEB was completely different from Lone Star's account of its sole acquisition of KEB. (*See* the diagram Ann's Organizations drew reflecting the actual investment structure for the KEB acquisition, which is attached hereto as Exhibit C ("Actual Investment Structure").

20.     The Actual Investment Structure indicates that Lone Star omitted in Lone Star's Investment Structure three more investment vehicles set up in Bermuda—in addition to KEB Investors, L.P. (Bermuda) appearing in Lone Star's Investment Structure—that received funds from non-Lone Star investors used for the acquisition of KEB: KEB Investors II, L.P. (Bermuda) ("KEB Investors II"), KEB Investors III, L.P. (Bermuda) and KEB Investors IV, L.P. (Bermuda) (collectively, the "Nominee Investment Entities"). Attached hereto as Exhibit D is a document Ann's Organizations obtained from the official website of Registrar of Companies of Bermuda that contains information about the Nominee Investment Entities. Indeed, as fully alleged in the following paragraphs, this scheme utilizing the Nominee Investment Entities was designed to deceive South Korean financial regulators.

---

[2] Lone Star made this assertion in the Notification of Dispute and Accompanying Memorandum given to the South Korean government outlining basis of dispute as required by Article 8.1 of the BIT (note 3, at 26).

21.     In this context, a question should quickly arise: whether the South Korean regulators would have approved Lone Star's request for its take-over of KEB had the Actual Investment Structure with the Nominee Investment Entities been disclosed to them. The answer to this question would have been certainly 'no.' Therefore, as relevant to this action, given that according to Article 2.1 of the BIT the South Korean government shall "admit [Lone Star's] investments in accordance with its laws and regulations[,]" Plaintiff alleges that Lone Star's acquisition of KEB was in violation of the relevant South Korean laws and regulations; and thus that Lone Star was not entitled to submit its alleged dispute to ICSID in the first place.[3]

22.     ICSID held, in *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, ¶ 144 (Aug. 27. 2008), that:

> "The principle of good faith encompasses, *inter alia*, the obligation for the investor to provide the host State with relevant and material information concerning the investor and the investment. This obligation is particularly important when the information is necessary for obtaining the State's approval of the investment." [4]

---

[3] To the same effect is Article 2 of the 1974 version of the BIT (Agreement between the Republic of Korea, on the hand and the Belgo-Luxembourg Economic Union, on the other hand on the Encouragement and Reciprocal Protection of Investments), which was effective at the time of Lone Star's acquisition of KEB in 2003. Said article provides that: "(1) Each Contracting Party shall admit in its territory investments by nationals or legal persons of the other Contracting Party in accordance with its legislation and shall encourage such investments[; and] (2) In particular, each Contracting Party shall authorize the conclusion and execution of licencing contracts and of contracts relating to commercial, administrative or technical assistance, in so far those activities are connected with investments as mentioned in paragraph 1."

[4] This case decision is available at http://www.italaw.com/cases/documents/862 (last visited on July 16, 2022).

Thus, in light of the foregoing principles, the Tribunal decided that: "the investment was obtained by deceitful conduct that is in violation of Bulgarian law." (*Id*, ¶ 143) Similarly, in *Alasdair Ross Anderson et al v. Republic of Cost Rica*, ICSID Case. No. ARB(AF)/07/3, Award (May 3, 2016), ICSID concluded that a violation of host State laws and lack of due diligence to comply with such law resulted in a want of jurisdiction.[5]

23.     As shown above, fraudulent misrepresentation or fraud on the investor's part generally constitutes a violation of good faith that bars the investor from invoking the substantial protective rights of a treaty. Here, in this case, as addressed above and further alleged below, Lone Star's acquisition of a 51% stake in KEB obtained by its fraudulent misrepresentations regarding the sources of funds to be used to acquire the majority stake was "contrary to the basic notion of international public policy—that a contract obtained by wrongful means (fraudulent misrepresentation) should not be enforced by a tribunal." *Plama Consortium Limited*, ICSID Case No. ARB/03/24 at ¶ 143.

24.     Article 1-1 of the BIT states that "'investments' means every kind of asset owned or controlled, directly or *indirectly*, by an investor of one Contracting Party in the territory of the other Contracting Party..." (emphasis added).[6]  Hence, turning to this case,

---

[5] This case decision is available at http://www.italaw.com/cases/documents/86 (last visited on July 16, 2022).
[6] The 1976 version of the BIT also provides, in Article 3(1), that "[t]he term 'investments' shall comprise every direct or indirect contribution of capital and any other kind of assets..."

the non-Lone Star investors that made investments in KEB through the Nominee Investment Entities are "investors," or made "investments" under the BIT.

25.     Furthermore, "investments made in breach of fundamental principles of the host State's law, e.g. by fraudulent misrepresentations or *the dissimulation of true ownership*" are not investments made "according to its laws and regulations." *Desert Line Projects LLC v. The Republic of Yemen*, ICSID Case. No. ARB/05/17, Award, ¶ 104 (Feb. 6, 2008) (citation omitted)(emphasis added).[7]

26.     As more specifically alleged below, when requesting to the South Korean regulators for the acquisition of KEB, Lone Star embarked on a dissimulation of true investors in KEB, which was in breach of South Korean laws and regulations governing acquisition of a stake in a bank.

### Lone Star's Dissimulation Of True Ownership Structure Using Nominee Entities

27.     On or about April 7, 2006, ABN AMRO Bank N.V., a Dutch bank with headquarters in Amsterdam, Netherland, posted at its official website press release materials, entitled "ABN AMRO reports pro-forma 2005 results under new structure[,]" that drew a special attention from Ann's Organizations, a copy of which is attached hereto as Exhibit E. This document indicates (at pages 6-7): 1) that ABN AMRO has a stake in KEB; 2) that ABN AMRO's "shareholding in Korean [sic] Exchange Bank (KEB)" as the bank terms involves Risk Weighted Asset of EUR 0.3 billion; 3) that while the transaction was originated in the Business Unit ("BU") Private Equity, the stake in KEB

---

[7] This case decision is available at http://www.italaw.com/cases/documents/357 (last visited on July 16, 2022).

has been transferred to the BU Global Clients from the BU Private Equity; and 4) that financial results of the BU Asia include marked-to-market valuation of KEB (*see* Exhibit F, which is excerpts from ABN AMRO's press release, dated April 26, 2007, announcing its full first quarter 2007 results, posted at its official website).

28.     Taking into consideration ABN AMRO's presentations above, Ann understands: 1) that given that ABN AMRO (including its subsidiaries or affiliates) has never been in the shareholder list of KEB, ABN AMRO acquired its stake in KEB through one of the Nominee Investment Entities set up by Lone Star in Bermuda; 2) that the investment transaction in question was client(located in Asia)-driven as the financial results from the transaction has been reflected in the BU Asia rather than Group Functions; and 3) that ABN AMRO's "shareholding" in KEB was not an outright investment by the bank alone, but a result of profit sharing of client(s)'s investment in KEB in consideration for ABN AMRO's loan to the client in the amount of EUR 0.3 billion (Risk Weighted Asset allotted to the transaction) considering that on Ann's calculation the marked-to-market valuation on a quarterly basis does not account for ABN AMRO's capital use of EUR 0.3 billion—in other words, the quarterly marked-to-market adjustment reflecting KEB share price changes is downsized compared with EUR 0.3 billion investment, which means, to put in short, that the profit or loss is too small (*see* Exhibit F; Exhibit G, which is excerpts from ABN AMRO's press release, dated July 31, 2006, announcing its first half 2006 results, posted at its official website).

29.     Other than for the purposes stated above, Ann can imagine no reason why ABN AMRO did not make its own investment in KEB—vis-à-vis making an indirect

investment in one of the Nominee Investment Entities—by subscribing to right issues in 2003 or forming a consortium with Lone Star as initially suggested or advised by South Korean regulators. In sum, Ann alleges that the overall financial scheme to take over KEB was cloaked in secrecy and was designed to avoid notice by the public or detection by the South Korean governmental authorities.

30.     Ann's Organizations further found out: 1) that AAC Capital Partners (f.k.a., AMRO Capital) was ABN AMRO's private equity firm—which is an "Investment/Merchant Bank Investing Own or Client Funds"—that originated the investment in KEB; and 2) that Chu Kim was the employee of the firm in charge of the KEB transaction. (*See* Thomson Financial's Funds/Portfolio Report regarding AAC Capital Partners, which is attached hereto as Exhibit H, at pages 1-2).

31.     On information and belief, Ann identifies as the real investor hidden behind AAC Capital Partners with respect to ABN AMRO's stake in KEB, a company, named The Total Companies, L.L.C. ("Total Companies"), which was a LA-based building cleaning company owned by Young Jun Han (a.k.a., Joseph Han) prior to the Lone Star's acquisition of KEB in 2003. Stated differently, Ann alleges that Total Companies, its affiliates, or a person(s) or entities closely related to Young Jun Han, were the true owner of ABN AMRO's "shareholding" in KEB through its investment in a private equity funds managed by AAC Capital Partners, which in turn provided funds to one of the Nominee Investment Entities set up by Lone Star in Bermuda. (As grounds for this allegation, three news articles in Korean language are attached hereto as Exhibit I).

32.     In the new articles attached as Exhibit I, South Korean media outlets purported to take issue with Total Companies' wielding its collusive ties with top politicians in obtaining its role as an agent for sale of overseas non-performing loans or distressed debt instruments held by South Korean government agencies and KEB prior to Lone Star's take-over of KEB. In this context, Ann alleges that there was a high possibility that the funds provided to AAC Capital Partners to purchase a stake in KEB through one of the Nominee Investment Entities were proceeds of crimes that had been formed in violation of laws and regulations of South Korea, and/or fled South Korean jurisdiction.

33.     Ann's Organizations also ascertained that Stanford University Board of Trustees of the Leland Stanford Junior University (the "Stanford University Trustees") invested in KEB through KEB Investors II. (*See* pertinent excerpts from the Tax Return filed by the Stanford University Trustees for the 2007 calendar year (Open to Public Inspection), which is attached hereto as Exhibit J). The ending valuation of such investment amounted to U$ 170,376,581, with the 63.80 percentage ownership interest in KEB Investors II. (*Id*. at 2) Significantly, the document reveals that KEB Investors II is a subsidiary of and controlled by the Stanford University Trustees, not Lone Star. (*Id*. at 2, 3)

34.     Ann's allegation that Lone Star and LSF-KEB acted as nominee to conceal from the South Korean regulators in 2003 identities of true investors representing more than 40 percent ownership interest in KEB is also verified by the HSBC's public disclosure, released on September 3, 2007, with The Stock Exchange of Hong Kong with

regard to the bank's agreement to acquire majority shareholding in KEB from Lone Star. (*See* HSBC's Public Disclosure, which is attached hereto as Exhibit K). The document clearly shows that Lone Star was not a single buyer of KEB, stating, in relevant part, that LSF-KEB's "ultimate investors include *the investors in Lone Star Fund IV (US) LP* and *other institutional investors*." (*See id.* at page 5) (emphasis added).

35.     If an *ex ante* identification of ultimate investors in KEB by the South Korean regulators was possible, it goes without saying that the regulators would not have approved the foreign ownership of KEB by an investment vehicle, i.e. LSF-KEB, that was funded partly by another investment funds established in tax haven areas, part of which might have included proceeds of crimes formed in breach of South Korean laws and regulations. Phrased differently, the South Korean regulators would have certainly rejected Lone Star's plan to take over the ownership and management of KEB with funds that might have included illicit sources of funds disguised as foreign capital. This is precisely the reason why the South Korean financial regulators are, under relevant laws and regulations, required to screen and ascertain the sources of funds to be used to acquire a majority stake in a Korean bank.

### Comparison With BCCI's Purchase of U.S. Banks Through Nominee Arrangements

36.     Lone Star's dissimulation of true ultimate investors in this case is squarely analogous to that conducted by the Bank of Credit and Commerce International ("BCCI"), an international bank founded in 1972 by Agha Hasan Abedi, a Pakistan banker, when it acquired several U.S. banks through multi-layers of nominee entities .

37.     Starting from 1977, BCCI developed various strategies to infiltrate the U.S. banking system, which it successfully implemented, despite regulatory barriers that were designed to keep it out. These included purchasing banks through nominees. Regulatory suspicion in the United States towards BCCI required it to deceive regulators in collusion with nominees including entities controlled by Ghaith R. Pharaon, an important banker in the Middle East.

38.     As relevant to this case, on February 4, 1997, finding that "Pharaon acted illegally as a secret nominee for BCCI when he acquired the Independence Bank of Encino, California in 1985[,]" the Federal Reserve Board "assessed a $37 million fine against Pharaon, and permanently barred him from the U.S. banking industry due to his illegal activities." (*See* the Federal Reserve Board's press release dated February 4, 1997, which is attached hereto as Exhibit L).

## CLAIM FOR RELIEF
### (Request for Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Fed.R.Civ.P. Rule 57)

39.     Plaintiff incorporate by reference the allegations set forth above as if fully set forth herein.

40.     As demonstrated by the facts alleged above, Lone Star was not a sole majority shareholder of KEB as it represented to the South Korean regulators at the time of its approval of Lone Star's acquisition of KEB. Indeed, Lone Star provided other investors in KEB with nominee arrangements to conceal their existence or identities from the South Korean regulators.

41.     Of significance, as set forth above, there are ample evidence to substantiate Plaintiff's allegation that the investor(s) behind AAC Capital Partners made use of Lone Star's nominee investment vehicles to launder money obtained from unlawful activities possibly perpetrated in South Korea.

42.     In view of the foregoing facts alleged, the FSC's approval of Lone Star's acquisition of KEB in 2003 was unlawfully obtained by Lone Star's deceitful conducts, and thus, LSF-KEB is not entitled to seek the protection of the BIT.

WHEREFORE, Plaintiff prays for relief as follows:

A.  A declaratory judgment that Lone Star provided, out of its own funds, only less than 60 % of the total funds used for the acquisition of KEB in 2003 through LSF-KEB while Lone Star managed shell nominee investment vehicles in Bermuda for other independent or non-Lone Star investors, who provided the remaining portion of the acquisition funds;

B.  A declaratory judgment that during the course of approving Lone Star's purported acquisition of KEB in September 2003, the South Korean regulators—which had the authority to assess the fitness of the buyer of a bank—were provided by Lone Star with no information about actual non-Lone Star investors in KEB other than Lone Star's representation to them that Lone Star would be a sole majority shareholder of KEB as a result of the approval;

C.  Awarding costs, expenses and attorney fees, as the case may be, as allowed by law; and

D. Any other and further relief which the Court may deem just and proper.

## **RESERVATION OF RIGHTS**

Plaintiff reserves its right to amend this original Complaint to assert any additional claims for relief against Defendants or other parties as may be warranted under the circumstances and as allowed by law.

RESPECTFULLY SUBMITTED this 8th day of August, 2022.

_____

Wongu Ann, *pro se*

c/o No Joon Park
2512 Carroll Ct.
Flower Mound, Texas 75022
Phone) (972) 672-7480

annwongu@gmail.com

*Plaintiff proceeding pro se*

# EXHIBIT A

Press Release in Korean Language by the Financial Supervisory
Commission of South Korea, Dated September 27, 2003



# 보 도 자 료



금융감독원

| ・작성부서 | 금감위 은행감독과, 금감원 은행감독국 은행총괄팀 | | |
|---|---|---|---|
| ・담 당 자 | 송현도 사무관(☎3771-5164), 이병화 팀장 (☎ 3786-8029) | | |
| ・배 포 일 | 2003. 9. 27. | 배포부서 | 공보실 (☎ 3771-5788~89) |

※ 이 자료는 9월 27일(토) 조간부터 취급하여 주시기 바랍니다.

## 제 목 : 론스타의 외환은행 주식취득 승인

## 주요 내용

금융감독위원회는 2003. 9. 26(금) 정례회의에서 론스타의 외환은행 주식취득 신청을 승인하였다.

금감위 승인의 구체적 내용은 론스타펀드 Ⅳ가 100% 의결권을 보유한 LSF-KEB Holdings의 외환은행의 의결권있는 발행주식 총수의 51%(콜옵션 행사시 65.23%)보유를 승인하고 론스타측이 콜옵션 행사(발행주식 총수의 최대 14.23%)시에는 미리 금감위에 보고토록 하는 등의 부대조건을 부과하였다.

금감위는 론스타의 주식취득 승인여부를 심의하는 과정에서 론스타의 신규 투자(10,750억원)로 인해 외환은행의 재무건전성이 강화되어 조속한 경영정상화가 가능하다는 점, 론스타가 외환은행 인수후의 경영계획을 통하여 동행의 정상화와 한국금융산업 발전에 기여하겠다는 적극적인 의지와 계획을 가지고 있는 점 등을 인정하여 이를 승인하였다.

※ 금융감독위원회・금융감독원의 보도자료는 인터넷(http://www.fsc.go.kr와  www.fss.or.kr)에 수록되어 있습니다

(1/1)

EXHIBIT A-001

# EXHIBIT B

**Diagram Depicting Lone Star's Investment Structure**



EXHIBIT B-001

# EXHIBIT C

Diagram Depicting Actual Investment Structure



EXHIBIT C−001

# EXHIBIT D

Document Obtained From Registrar of Companies of Bermuda

| 34136 | KEB HOLDINGS, L.P. | Active | 9/3/2003 |
|---|---|---|---|
| 34136 | KEB HOLDINGS, L.P. | Active | 9/3/2003 |
| 34301 | KEB INVESTORS III, L.P. | Active | 10/10/2003 |
| 34301 | KEB INVESTORS III, L.P. | Active | 10/10/2003 |
| 34219 | KEB INVESTORS II, L.P. | Active | 9/24/2003 |
| 34219 | KEB INVESTORS II, L.P. | Active | 9/24/2003 |
| 34333 | KEB INVESTORS IV, L.P. | Active | 10/24/2003 |
| 34333 | KEB INVESTORS IV, L.P. | Active | 10/24/2003 |
| 34137 | KEB INVESTORS, L.P. | Active | 9/3/2003 |
| 34137 | KEB INVESTORS, L.P. | Active | 9/3/2003 |

EXHIBIT D−001

# EXHIBIT E

ABN AMRO's Press Release Dated April 7, 2006

 **ABN·AMRO**

Further information can be obtained from:
Press Relations: +31 20 6288900
Investor Relations: +31 20 6287835

This press release is also available on the
internet: www.abnamro.com

---

## IR / Press Release

Amsterdam, 7 April 2006

**ABN AMRO reports pro-forma 2005 results under new structure**

ABN AMRO today presents its pro-forma results for 2005 which reflect the changes to its organisational structure that were announced in October 2005 and which became effective on 1 January 2006. The results have been prepared to facilitate comparison of the quarterly performance of the bank in 2006 with that of 2005. They do not replace the official full-year results that were published on 31 January 2006.

On 26 April 2006 ABN AMRO will publish its first-quarter results for 2006 under the new structure.

Hugh Scott-Barrett, Chief Financial Officer, will host a conference call for analysts and investors today at 15.00 hrs CET (14.00 hrs GMT) to elaborate on the pro-forma 2005 results. Details can be found on www.abnamro.com/com/ir/events.jsp.

**ABN AMRO's new structure from 1 January 2006**

The new structure is designed to align the organisation with the Group's mid-market strategy and to open up its network offering and product suite to all its clients in order to accelerate organic growth.

**Business Unit (BU) Overview:**



EXHIBIT E-001

The new structure comprises:

*Seven client BUs:*
Five regional client BUs: the Netherlands, Europe, North America, Latin America, Asia
Two global client BUs: Private Clients, Global Clients

*Three product BUs*
Product BUs: Global Markets, Transaction Banking, Asset Management

*Services* creates value across the group by focussing on improving service quality, increasing efficiency, optimising operational risk and increasing agility.

*Group Functions* provides guidance on ABN AMRO's corporate strategy and supports the implementation of the strategy according to our Managing for Value methodology and our Corporate Values and Business Principles.

The cross-BU segments (Consumer and Commercial) that were previously introduced continue to exist in addition to the BUs. These cross-BU segments ensure alignment between the product, client and services organisations, for example by exchanging best practices and winning formulas across the Group.

In the new structure, the former Wholesale Clients Strategic Business Unit (SBU) has been unbundled and integrated into the BU Global Clients, the regional client BUs and product BUs in order to make these services available to all our clients. The BU Global Clients will focus on a select group of multinational companies that need to be served on a global basis. The commercial clients have been integrated into the five regional client BUs, while the former WCS products fall under the product BU Global Markets.

**External reporting structure from 2006**

As a result of the changes in the structure of the bank, ABN AMRO will publish its results along the business lines as detailed below:

- BU Netherlands (including Bouwfonds mortgages)
- BU Europe (including Banca Antonveneta)
- BU North America
- BU Latin America
- BU Asia
- BU Private Clients
- BU Global Clients
- BU Asset Management
- BU Private Equity
- Group Functions, including Group Services

The BU Netherlands will include the mortgage related activities of Bouwfonds. As stated in December 2005, ABN AMRO will divest the non-mortgage activities of Bouwfonds in the course of 2006. For the pro-forma 2005 results, the non-mortgage activities of Bouwfonds have been reported separately.

The BU Europe will consolidate the results of Banca Antonveneta as from the first quarter of 2006 following the acquisition of a majority stake on 2 January 2006. The results of Banca Antonveneta will also be reported separately which will make it possible to track progress. For the pro-forma 2005 results, our stake at the end of 2005 of 29.91% in Banca Antonveneta has been reported under Group Functions as before, similar to our stakes in Capitalia and K&H Bank.

In the new structure the Wholesale Clients SBU has been unbundled and integrated in the BU Global Clients and BU Global Markets, while its commercial clients have been transferred to the regions. The client driven revenues of the BU Global Markets will be reported in the regional client BUs or the BU Global Clients. The proprietary trading income and the futures business of the BU Global Markets will be reported in Group Functions.

EXHIBIT E−002

ABN AMRO will provide financial information on the BU Global Markets on a quarterly basis which will make it possible to track progress against previously communicated targets. The financial information provided with the first and third quarter results will be limited to the efficiency ratio, whereas the updates provided with the half year and full year results will include an income statement. ABN AMRO will also provide financial information on the Consumer and Commercial segments on a bi-annual basis and Transaction Banking on an annual basis.

**2005 pro-forma results**

The pro-forma results reflect the reconstructed 2005 results of the new BUs assuming the new reporting structure had been in place during 2005. In order to determine the results presented, the former Wholesale Clients SBU results have been split into those of the regional client BUs, Global Client BU and Group Functions, consistently applying relevant allocation keys for revenues and expenses. Revenues are attributed to the Global Clients BU on the basis of a defined name-by-name list of Global Clients. The costs of Global Clients include the directly attributable costs of the BU and the allocated costs of the products sold to the Global Clients. The product costs are allocated on the basis of defined cost drivers as applied for management information purposes. Group Functions results include the results of a defined set of products, for which the product costs are allocated on the basis of defined cost drivers. The regional BU results include the results on our Commercial Clients in the respective regions and on Global Markets products other than the results from proprietary trading and futures which are included in Group Functions. The revenue is attributed to those regions where the transactions were performed and the costs allocated on the basis of defined cost drivers. The numbers presented may contain rounding differences. The pro-forma results are exclusive of the effect of a line-by-line consolidation in the income statement of the Private Equity holdings that are consolidated under IFRS.

**Group**

| Group Total (EUR mln) Full Year 2005 | Regions | | | | | | Global Clients | Private Clients | Asset Mngt | GF/GS | PE | Total Bank |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | NL Incl Bouwfonds Mortgage | NL Bouwfonds non Mortgage | Europe | NA | LA | Asia | | | | | | |
| Operating income | 4,629 | 505 | 1,109 | 3,897 | 3,064 | 1,235 | 2,348 | 1,297 | 712 | 650 | 381 | 19,827 |
| Operating expenses | 3,282 | 287 | 1,208 | 2,594 | 1,848 | 914 | 1,765 | 915 | 501 | 74 | 129 | 13,517 |
| Operating result | 1,348 | 218 | (99) | 1,303 | 1,216 | 321 | 583 | 382 | 211 | 576 | 252 | 6,310 |
| Provision for loan losses | 286 | 13 | (35) | (87) | 348 | 27 | (50) | 16 | 0 | 96 | 34 | 648 |
| Operating result before taxes | 1,062 | 205 | (64) | 1,389 | 868 | 294 | 633 | 366 | 211 | 480 | 218 | 5,662 |
| Taxes | 323 | 69 | 40 | 303 | 265 | 90 | 80 | 87 | 39 | (33) | (45) | 1,218 |
| Profit for the period | 739 | 136 | (104) | 1,086 | 603 | 204 | 553 | 279 | 171 | 513 | 263 | 4,443 |
| Efficiency Ratio | 70.9% | 56.8% | 108.9% | 66.6% | 60.3% | 74.0% | 75.2% | 70.6% | 70.4% | | 33.9% | 68.2% |
| RWA | 65.8 | 12.9 | 28.1 | 74.2 | 18.7 | 11.9 | 28.2 | 9.4 | 0.8 | 7.1 | 2.7 | 257.9 |

EXHIBIT E-003

**BU Netherlands (BU NL)**

| FY 2005 (mln EUR) | former BU NL | WCS NL | BF Mortgage | Other | new BU NL |
|---|---|---|---|---|---|
| Operating income | 3,684 | 582 | 366 | (3) | 4,629 |
| Operating expenses | 2,675 | 513 | 94 | 0 | 3,282 |
| Operating result | 1,009 | 69 | 272 | (2) | 1,348 |
| Provisioning | 277 | (5) | 13 | 1 | 286 |
| Operating result before taxes | 732 | 74 | 259 | (4) | 1,061 |
| Taxes | 223 | 22 | 80 | (2) | 323 |
| Net operating profit | 509 | 52 | 179 | (1) | 739 |
| | | | | | |
| Efficiency ratio | 72.6% | 88.1% | 25.7% | | 70.9% |
| RWA (bln) | 47.3 | 5.1 | 13.0 | 0.4 | 65.8 |

The BU Netherlands includes the results from the former Consumer & Commercial Client (C&CC) BU Netherlands, the Dutch commercial clients from former WCS and the mortgage activities from Bouwfonds.

**Bouwfonds non-mortgage activities**

| FY 2005 (mln EUR) | |
|---|---|
| Operating income | 505 |
| Operating expenses | 287 |
| Operating result | 218 |
| Provisioning | 13 |
| Operating result before taxes | 205 |
| Taxes | 69 |
| Net operating profit | 136 |
| | |
| Efficiency ratio | 56.8% |
| RWA (bln) | 12.9 |

**BU Europe**

| FY 2005 (mln EUR) | WCS Europe | Other | new BU Europe |
|---|---|---|---|
| Operating income | 1,073 | 36 | 1,109 |
| Operating expenses | 1,164 | 44 | 1,208 |
| Operating result | (91) | (8) | (99) |
| Provisioning | (37) | 2 | (35) |
| Operating result before taxes | (54) | (10) | (64) |
| Taxes | 42 | (2) | 40 |
| Net operating profit | (96) | (8) | (104) |
| | | | |
| Efficiency ratio | 108.5% | | 108.9% |
| RWA (bln) | 27.7 | 0.4 | 28.1 |

The BU Europe results include the European (excluding Dutch) commercial clients from the former WCS business. The former C&CC activities in Europe, which were previously reported under the BU New Growth Markets (NGM), are included in 'other'.

The reported results of the BU Europe reflect the fact that a significant part of the WCS business has been transferred to the BU Europe and that this part was a high efficiency ratio business. Management of the BU Europe, in cooperation with the management teams of Global Markets, Transaction Banking and Services will focus on improving the financial performance of the business in 2006. Further details on the initiatives planned to improve the infrastructural efficiency, including any investments associated with those initiatives, will be given with the first quarter results.

4

EXHIBIT E−004

**BU North America (BU NA)**

| FY 2005 (mln EUR) | former BU NA | WCS NA | Other | new BU NA |
|---|---|---|---|---|
| Operating income | 3,483 | 421 | (7) | 3,897 |
| Operating expenses | 2,236 | 364 | (6) | 2,594 |
| Operating result | 1,247 | 57 | (1) | 1,303 |
| Provisioning | 21 | (108) | 0 | (87) |
| Operating result before taxes | 1,226 | 164 | 0 | 1,390 |
| Taxes | 355 | (52) | 0 | 303 |
| Net operating profit | 871 | 216 | 0 | 1,086 |
| | | | | |
| Efficiency ratio | 64.2% | 86.5% | | 66.6% |
| RWA (bln) | 66.7 | 7.5 | 0 | 74.2 |

The results from the BU North America include the results from the former C&CC BU North America and the commercial clients from the former WCS business.

**BU Latin America (BU LA)**

| FY 2005 (mln EUR) | former BU Brazil | WCS LA | new BU LA |
|---|---|---|---|
| Operating income | 2,975 | 88 | 3,064 |
| Operating expenses | 1,730 | 118 | 1,848 |
| Operating result | 1,245 | (30) | 1,216 |
| Provisioning | 363 | (15) | 348 |
| Operating result before taxes | 882 | (15) | 868 |
| Taxes | 238 | 26 | 265 |
| Net operating profit | 644 | (41) | 603 |
| | | | |
| Efficiency ratio | 58.2% | 134.1% | 60.3% |
| RWA (bln) | 14.8 | 4.0 | 18.7 |

The results from the BU Latin America include the results from the former C&CC BU Brazil and the commercial clients from the former WCS business.

**BU Asia**

| FY 2005 (mln EUR) | NGM Asia | WCS Asia | new BU Asia |
|---|---|---|---|
| Operating income | 605 | 630 | 1,235 |
| Operating expenses | 308 | 606 | 914 |
| Operating result | 297 | 24 | 321 |
| Provisioning | 54 | (27) | 27 |
| Operating result before taxes | 243 | 51 | 294 |
| Taxes | 46 | 44 | 90 |
| Net operating profit | 196 | 8 | 204 |
| | | | |
| Efficiency ratio | 50.9% | 96.2% | 74.0% |
| RWA (bln) | 3.9 | 8.0 | 11.9 |

The BU Asia includes the results from the Asian activities of both the former C&CC BU NGM and the commercial clients of the former WCS business.

EXHIBIT E-005

**BU Private Clients (BU PC)**

| FY 2005 (mln EUR) | former BU PC | Other | new BU PC |
|---|---|---|---|
| Operating income | 1,225 | 72 | 1,297 |
| Operating expenses | 891 | 24 | 915 |
| Operating result | 334 | 48 | 382 |
| Provisioning | 6 | 10 | 16 |
| Operating result before taxes | 328 | 38 | 366 |
| Taxes | 73 | 14 | 87 |
| Net operating profit | 255 | 24 | 279 |
| | | | |
| Efficiency ratio | 72.7% | 33.3% | 70.6% |
| RWA (bln) | 7.3 | 2.1 | 9.4 |

**BU Global Clients (BU GC)**

| FY 2005 (mln EUR) | former WCS | transfer KEB | BU GC |
|---|---|---|---|
| Operating income | 2,279 | 69 | 2,348 |
| Operating expenses | 1,764 | 1 | 1,765 |
| Operating result | 515 | 68 | 583 |
| Provisioning | (50) | 0 | (50) |
| Operating result before taxes | 565 | 68 | 633 |
| Taxes | 80 | 0 | 80 |
| Net operating profit | 485 | 68 | 553 |
| | | | |
| Efficiency ratio | 77.4% | | 75.2% |
| RWA (bln) | 25.8 | 0.3 | 26.2 |

As of 1 January 2006 our shareholding in Korean Exchange Bank (KEB) has been transferred from the BU Private Equity to the BU Global Clients. In the pro-forma 2005 results we have already included KEB in the BU Global Clients.

**BU Asset Management (BU AM)**

The results of the BU Asset Management are not affected by the change to the new structure.

**Group Functions (GF) incl Group Services (GS)**

| FY 2005 (mln EUR) | former BU GF/GS | former WCS | Other | new BU GF/GS |
|---|---|---|---|---|
| Operating income | 379 | 268 | 3 | 650 |
| Operating expenses | (95) | 170 | (1) | 74 |
| Operating result | 474 | 98 | 4 | 576 |
| Provisioning | 95 | 1 | 0 | 96 |
| Operating result before taxes | 379 | 97 | 4 | 480 |
| Taxes | (50) | 16 | 1 | (33) |
| Net operating profit | 429 | 82 | 3 | 513 |
| | | | | |
| RWA (bln) | 8.6 | (1.1) | (0.4) | 7.1 |

Under the new structure the results from proprietary trading and futures (Global Markets revenues that can not be allocated to the regions as they are not related to clients) are included in Group Functions. In the pro-forma 2005 numbers Group Functions also includes the stakes in Banca Antonveneta, Capitalia, and K&H Bank.

6

# EXHIBIT E-006

**BU Private Equity (BU PE)**

| FY 2005 (mln EUR) | former BU PE | transfer KEB | new BU PE |
|---|---|---|---|
| Operating income | 450 | 69 | 381 |
| Operating expenses | 130 | 1 | 129 |
| Operating result | 320 | 68 | 252 |
| Provisioning | 34 | 0 | 34 |
| Operating result before taxes | 286 | 68 | 218 |
| Taxes | (45) | 0 | (45) |
| Net operating profit | 331 | 68 | 263 |
| | | | |
| Efficiency ratio | 28.9% | | 33.9% |
| RWA (bln) | 3.0 | 0.3 | 2.7 |

As of 1 January 2006 ABN AMRO's shareholding in Korean Exchange Bank (KEB) has been transferred from the BU Private Equity to the BU Global Clients. In the pro-forma results we have already included KEB in the BU Global Clients.

**Global Markets**

| FY 2005 (mln EUR) | |
|---|---|
| Operating income | 3,294 |
| Operating expenses | 2,994 |
| Operating result | 301 |
| Provisioning | (15) |
| Operating result before taxes | 316 |
| Taxes | 15 |
| Net operating profit | 301 |
| | |
| Efficiency ratio | 90.9% |

The efficiency ratio of Global Markets at the end of 2005 was 90.9%. We will provide quarterly updates on Global Markets (as of the first quarter results of 2006). The commitments set at the Investor Day are an improvement in efficiency ratio of 5% points in 2006 and an efficiency ratio of below 80% by the end of 2008.

EXHIBIT E-007

Appendix 1a

**2005 quarterly breakdown per BU**

| Group Total (EUR mln) Q-1 2005 | Regions | | | | | | Global Clients | Private Clients | Asset Mngt | GF/GS | PE | Total Bank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NL Incl Bouwfonds Mortgage | NL Bouwfonds non Mortgage | Europe | NA | LA | Asia | | | | | | |
| Operating income | 1,135 | 125 | 226 | 887 | 543 | 259 | 505 | 303 | 157 | 188 | 123 | 4,451 |
| Operating expenses | 788 | 66 | 240 | 587 | 357 | 199 | 444 | 206 | 114 | 77 | 17 | 3,096 |
| Operating result | 347 | 59 | (14) | 300 | 187 | 60 | 60 | 96 | 43 | 111 | 106 | 1,356 |
| Provision for loan losses | 69 | 0 | (5) | (40) | 63 | 4 | (5) | (1) | 0 | 12 | 2 | 99 |
| Operating result before taxes | 278 | 59 | (9) | 340 | 124 | 56 | 65 | 97 | 43 | 99 | 104 | 1,257 |
| Taxes | 87 | 20 | 9 | 88 | 49 | 31 | 6 | 27 | 12 | 12 | (6) | 335 |
| Profit for the period | 191 | 39 | (18) | 253 | 75 | 25 | 59 | 70 | 31 | 88 | 110 | 921 |
| Efficiency Ratio | 69.4% | 52.8% | 106.2% | 66.2% | 65.7% | 76.8% | 87.9% | 68.0% | 72.6% | | 13.8% | 69.6% |

| Group Total (EUR mln) Q-2 2005 | Regions | | | | | | Global Clients | Private Clients | Asset Mngt | GF/GS | PE | Total Bank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NL Incl Bouwfonds Mortgage | NL Bouwfonds non Mortgage | Europe | NA | LA | Asia | | | | | | |
| Operating income | 1,125 | 118 | 334 | 878 | 672 | 298 | 555 | 312 | 182 | 259 | 98 | 4,830 |
| Operating expenses | 844 | 74 | 319 | 612 | 428 | 240 | 399 | 215 | 124 | 118 | 32 | 3,406 |
| Operating result | 281 | 44 | 15 | 266 | 244 | 57 | 156 | 97 | 58 | 141 | 66 | 1,425 |
| Provision for loan losses | 67 | (1) | (17) | 15 | 75 | (4) | (38) | 3 | 0 | (37) | 0 | 63 |
| Operating result before taxes | 214 | 45 | 32 | 251 | 169 | 61 | 194 | 94 | 58 | 178 | 66 | 1,362 |
| Taxes | 61 | 14 | 4 | 33 | 113 | 26 | 40 | 27 | 8 | 53 | (12) | 369 |
| Profit for the period | 153 | 31 | 28 | 218 | 56 | 36 | 153 | 67 | 50 | 124 | 78 | 993 |
| Efficiency Ratio | 75.0% | 62.7% | 95.5% | 69.7% | 63.7% | 80.5% | 71.9% | 68.9% | 68.1% | | 32.7% | 70.5% |

EXHIBIT E-008

Appendix 1b

| Group Total (EUR mln) Q-3 2005 | Regions | | | | | | Global Clients | Private Clients | Asset Mngt | GF/GS | PE | Total Bank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NL incl Bouwfonds Mortgage | NL Bouwfonds non Mortgage | Europe | NA | LA | Asia | | | | | | |
| Operating income | 1,237 | 123 | 247 | 1,024 | 989 | 352 | 544 | 341 | 186 | 215 | 49 | 5,308 |
| Operating expenses | 830 | 69 | 322 | 590 | 477 | 216 | 476 | 264 | 122 | 80 | 41 | 3,488 |
| Operating result | 407 | 54 | (75) | 434 | 511 | 136 | 68 | 77 | 64 | 135 | 8 | 1,820 |
| Provision for loan losses | 72 | 7 | 26 | (46) | 86 | 9 | (14) | 13 | 0 | 31 | 16 | 199 |
| Operating result before taxes | 335 | 47 | (101) | 481 | 425 | 128 | 82 | 64 | 64 | 104 | (8) | 1,621 |
| Taxes | 100 | 19 | (8) | 140 | 95 | 13 | 24 | 6 | 10 | 16 | (3) | 412 |
| Profit for the period | 235 | 28 | (93) | 341 | 331 | 115 | 58 | 57 | 54 | 88 | (5) | 1,208 |
| Efficiency Ratio | 67.1% | 56.1% | 130.4% | 57.6% | 48.2% | 61.4% | 87.5% | 77.4% | 65.6% | | 83.7% | 65.7% |

| Group Total (EUR mln) Q-4 2005 | Regions | | | | | | Global Clients | Private Clients | Asset Mngt | GF/GS | PE | Total Bank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NL incl Bouwfonds Mortgage | NL Bouwfonds non Mortgage | Europe | NA | LA | Asia | | | | | | |
| Operating income | 1,132 | 138 | 301 | 1,107 | 860 | 326 | 745 | 342 | 187 | (12) | 112 | 5,238 |
| Operating expenses | 819 | 78 | 326 | 805 | 586 | 259 | 446 | 229 | 141 | (201) | 39 | 3,527 |
| Operating result | 313 | 60 | (25) | 302 | 274 | 68 | 298 | 113 | 46 | 189 | 73 | 1,711 |
| Provision for loan losses | 78 | 6 | (38) | (15) | 124 | 18 | 7 | 1 | 0 | 90 | 16 | 288 |
| Operating result before taxes | 235 | 54 | 13 | 317 | 150 | 49 | 291 | 111 | 46 | 99 | 57 | 1,423 |
| Taxes | 75 | 16 | 34 | 43 | 9 | 20 | 10 | 27 | 9 | (115) | (25) | 101 |
| Profit for the period | 160 | 38 | (21) | 274 | 142 | 29 | 282 | 84 | 37 | 214 | 82 | 1,322 |
| Efficiency Ratio | 72.3% | 56.5% | 108.3% | 72.7% | 68.1% | 79.4% | 59.9% | 67.0% | 75.4% | | 34.8% | 67.3% |

EXHIBIT E–009

Appendix 2

**Split of former WCS over Global Clients, regions and Group Functions**

| FY 2005<br>(EUR mln) | Global Clients | Europe | NL | NA | LA | Asia | GF | Former WCS |
|---|---|---|---|---|---|---|---|---|
| Operating income | 2,279 | 1,073 | 582 | 421 | 88 | 630 | 268 | 5,341 |
| Operating expenses | 1,764 | 1,164 | 513 | 364 | 118 | 606 | 170 | 4,699 |
| Operating result | 515 | (91) | 69 | 57 | (30) | 24 | 98 | 642 |
| Provision for loan losses | (50) | (37) | (5) | (108) | (15) | (27) | 1 | (241) |
| Operating result before taxes | 565 | (54) | 74 | 164 | (15) | 51 | 97 | 883 |
| Taxes | 80 | 42 | 22 | (52) | 26 | 44 | 16 | 178 |
| Profit for the period | 485 | (96) | 52 | 216 | (41) | 8 | 82 | 705 |
| RWA | 25.8 | 27.7 | 5.1 | 7.5 | 4.0 | 8.0 | (1.1) | 77.0 |
| Efficiency ratio | 77.4% | 108.5% | 88.1% | 86.5% | 134.1% | 96.2% | 63.4% | 88.0% |

EXHIBIT E-010

# EXHIBIT F

ABN AMRO's Press Release Dated April 26, 2007

 **ABN·AMRO**

Further information can be obtained from:
Press Relations:    +31 20 628 8900
Investor Relations: +31 20 628 7835

This press release is also available on the
Internet: www.abnamro.com

## IR / Press Release

Amsterdam, 26 April 2007

**ABN AMRO reports full first quarter 2007 results:**
**Strong improvement in business performance**

- **This press release contains a further breakdown of the financial results and a more in-depth analysis relative to the summary published on 16 April 2007. This press release includes an adjustment of our results in light of developments in the status of the US Department of Justice (DOJ) investigation of EUR 365 million (see Update on the status of the DOJ investigation) resulting in a net profit for the period of EUR 1,064 mln.**

- **Net operating profit first quarter of 2007 of EUR 1,225 mln, up 25.5% compared with the first quarter of 2006, excluding the provision taken in light of the status of the DOJ investigation**
    - Operating income increased 10.5% driven by strong revenue increases across all regions, supported by a very good performance of Global Markets
    - Operating result up 20.8%, excluding the provision, on the back of strong revenue growth and good cost control
    - Efficiency ratio improvement of 2.8 percentage points to 66.6%, excluding the provision
    - Profit for the period up 29.0%, excluding the provision and including a EUR 97 mln gain on the sale of ABN AMRO Mortgage Group (the US mortgage business) and EUR 17 mln of results from the operations of the US mortgage business, booked in results from discontinued operations
    - BU Europe's profit for the period increased from EUR 18 mln to EUR 131 mln due to a strong improvement in the operating result
    - EPS from continuing operations, excluding the provision, improved 30% to 65 euro cents

- **Net operating profit first quarter of 2007 up 24.6% compared with fourth quarter of 2006, excluding the provision taken in light of the status of the DOJ investigation**
    - Operating income increased 1.6%
    - Operating expenses down 4.0%, excluding the provision, showing the results of cost control measures taken in the second half of 2006
    - Efficiency ratio improvement of 3.9 percentage points to 66.6%, excluding the provision

**Update on the status of the US Department of Justice investigation**
As previously disclosed, the US Department of Justice has been conducting a criminal investigation into our dollar clearing activities, OFAC compliance procedures and other Bank Secrecy Act compliance matters. The Bank has cooperated with these investigations and is currently in active discussions to resolve these matters. Those discussions recently have advanced to the point where it is appropriate to take a provision of EUR 365 million. If outstanding issues are successfully resolved in these discussions, we believe that this amount will be sufficient to resolve the material financial consequences of the investigations. The Bank affirms that it takes very seriously its obligations to comply with US economic sanctions and regulations.

**Chairman's statement**
"Our focus on growth, efficiency and acceleration has led to a significantly improved operating performance of EUR 2 bln. The increase in operating result reflects a strong contribution to revenues from our growth engines in Brazil, Italy and Asia, combined with the acceleration of our cost control initiatives. The resulting EPS of 65 euro cents, excluding the provision taken in light of the status of the DOJ investigation means that we are well on our way to beating the 2007 EPS target of EUR 2.30 (excluding major disposals and restructuring charges)."

EXHIBIT F-001

## The BU Asia

| (in millions of euros) | quarterly | | | | | | |
|---|---|---|---|---|---|---|---|
| | Q1 2007 | Q1 2006 | % change | % change [1] | Q4 2006 | % change | % change [1] |
| Net interest income | 155 | 147 | 5.4 | 14.7 | 165 | (6.1) | (5.8) |
| Net fees and commissions | 209 | 167 | 25.1 | 34.6 | 267 | (21.7) | (21.3) |
| Trading income / results fin. trans. | 195 | 83 | 134.9 | 150.5 | 108 | 80.6 | 81.5 |
| Results from equity holdings | 17 | 22 | (22.7) | (16.8) | 17 | 0.0 | 0.6 |
| Other operating income | 4 | 16 | (75.0) | (75.0) | 9 | (55.6) | (55.6) |
| Total operating income | 580 | 435 | 33.3 | 43.4 | 566 | 2.5 | 2.9 |
| Total operating expenses | 396 | 332 | 19.3 | 27.5 | 407 | (2.7) | (2.1) |
| Operating result | 184 | 103 | 78.6 | 94.5 | 159 | 15.7 | 15.7 |
| Loan impairment | 53 | 36 | 47.2 | 61.9 | 78 | (32.1) | (31.5) |
| Operating profit before tax | 131 | 67 | 95.5 | 111.9 | 81 | 61.7 | 61.2 |
| Income tax expense | 24 | 23 | 4.3 | 9.6 | 35 | (31.4) | (32.6) |
| Profit for the period | 107 | 44 | 143.2 | 165.5 | 46 | 132.6 | 132.6 |
| Efficiency ratio | 68.3% | 76.3% | | | 71.9% | | |
| 1) % change at constant foreign exchange rates (see annex 2) | | | | | | | |
| | 31 Mar 07 | 31 Mar 06 | % change | | 31 Dec 06 | % change | |
| Staff (fte) | 15,354 | 12,202 | 25.8 | | 14,141 | 8.6 | |
| (in billions of euros) | | | | | | | |
| Total assets | 75.2 | 67.3 | 11.7 | | 69.8 | 7.7 | |
| Risk-weighted assets | 18.3 | 17.1 | 7.0 | | 16.5 | 10.9 | |

As of 1 January 2007, the BU Asia includes the Global Clients Asia activities.

### First quarter 2007 compared with first quarter 2006

The year-on-year comparison of operating income and profit was positively impacted by the fair-market value changes of the stake in KEB (a positive EUR 52 mln in the first quarter of 2007 and a negative EUR 24 mln in the first quarter of 2006). Although the fair-market value change is a part of regular income, it creates substantial volatility in income.

- *Total operating income* increased by 33.3%, or EUR 145 mln, to EUR 580 mln, driven by strong growth in the consumer businesses, supported by the EUR 76 mln increase in revenues as a result of the fair-market value changes of our stake in KEB.

  Growth in the consumer business was driven by continued growth of the Van Gogh Preferred Banking (VGPB) business and Consumer Finance business. The number of clients in Asia increased to 3.3 million. Fee income from sale of wealth management products increased as a result of the strong equity markets. The growth was particularly strong in Singapore, Hong Kong and China where the equity markets showed a steady improvement.  The Assets under Administration of VGPB clients grew by 15% to EUR 8.2 billion. Net interest income also improved with significant growth in credit cards and personal loans in Indonesia, India and UAE. The number of credit cards increased by 14% to 2.9 million from the same quarter last year and end of period net receivables (excluding Taiwan) grew by 39%.

  Revenues from the commercial clients segment in the first quarter benefited from significant Mergers & Acquisitions (M&A) and Equity Capital Markets (ECM) deal closures in the Philippines, the United Arab Emirates, Hong Kong, India and Australia. In addition, cash management within Transaction Banking showed a strong increase in the first quarter of 2007 compared to the same quarter last year. Global Markets revenues held up well on the back of continued volatility in Asian equity markets. This led to a good performance overall but as a result of market volatility it was a lower first quarter compared with the same quarter last year.

  The contribution from Saudi Hollandi Bank decreased by EUR 7 mln to EUR 14 mln.

  India and China are two of our key countries in Asia and are a major focus of our growth efforts.  In China revenue increased 63%, showing that our efforts are starting to bear fruit.  The commercial business in China is seeing steady growth in its loan portfolio size, and is experiencing larger interest margins and higher commission income as a result of increasing asset sizes.  For the consumer business, VGPB revenues alone have grown 90% and Assets under Administration (AuA) increased by 15% from last year as has income from selling structured products.

  India had its best quarter ever, growing revenues by over 48%, riding on strong growth in business across client segments. Consumer revenues grew by 60%, primarily due to continued growth in the credit card and personal loan portfolios, as well as in commissions on third-party insurance products. The credit cards base grew by 19%, taking the overall client base to over 1.5 mln. The Commercial business grew by over 30% from the previous year as a result of strong performance across products,

20

# EXHIBIT F-002

especially Global Markets. The SME and mid-market client base more than doubled, largely driven by templated offerings. Highlights for the first quarter of 2007 include the closing of the high profile Tata-Corus deal and the continued success of the microfinance business which now reaches 391,590 very low-income households through 27 microfinance institutions across 17 states in India.

- *Total operating expenses* increased by 19.3% to EUR 396 mln, as we continued to invest in new branches, staff hires and marketing campaigns.  In the first quarter, we opened14 new branches across China, India and Pakistan.

- *The operating result* improved by 78.6% to EUR 184 mln.

- *Provisioning* increased by EUR 17 mln to EUR 53 mln or 122 basis points of average RWA, reflecting strong growth in consumer finance businesses, particularly in India and Indonesia.

- *Profit for the period* increased by 143.2% to EUR 107 mln, mainly due to an improved operating result, supported by lower provisioning and a lower effective tax rate.

**First quarter 2007 compared with fourth quarter 2006**

The quarter-on-quarter comparison of operating income and profit was positively impacted by the fair-market value changes of the stake in KEB (EUR 52 mln in the first quarter of 2007 and EUR 15 mln in the fourth quarter of 2006). Furthermore, the comparison was impacted by the EUR 10 mln gross (EUR 7 mln net) restructuring charge in the fourth quarter.

- *Total operating income* increased by 2.5%, driven by strong growth in the consumer businesses, supported by the EUR 67 mln increase in revenues as a result of the fair-market value changes of our stake in KEB.

  The first quarter 2007 was a record quarter for the consumer businesses. The strong performance was driven by the VGPB Wealth Management businesses in Greater China and Singapore, and the credit card businesses in India, UAE and Indonesia. Taiwan showed increasing revenue momentum as revenues grew by 14%, and provision levels are stabilised.

  The commercial business continued its expansion during the first quarter although this was generally a slower quarter following on from the exceptional closure to the year in the fourth quarter of 2006. Robust growth continued to be seen in Hong Kong, Taiwan, the Philippines and India. Product contributions came predominantly from Global Markets, M&A and ECM and Transaction Banking. M&A and ECM revenues closed several large transactions, including Maynilad, Qatar Telecom and Tata, while Transaction Banking was driven by strong growth in the cash management business which grew 15%. The sub-segments of SME and Inbound Clients continued to perform well.

- *Total operating expenses* decreased by 2.7%. Adjusted for the EUR 10 mln restructuring charge in the fourth quarter of 2006, expenses were flat, reflecting strong cost control.

- *The operating result* increased by 15.7% to EUR 184 mln.

- *Provisioning* decreased by EUR 25 mln to EUR 53 mln, mainly due to certain exceptional items in the fourth quarter. In addition, the credit situation in Taiwan is showing signs of improvement and provision levels are trending downwards.

- *Profit for the period* increased by 132.6% to EUR 107 mln.

**Recent developments**

On 5 March 2007, ABN AMRO announced it had entered into an agreement to acquire a 93.4% interest in Prime Bank from shareholders for a cash consideration of PKR 13.8 bln (EUR 172 mln). On the same date, a tender offer was launched for all remaining shares of Prime Bank from minority shareholders, which was subsequently closed on 5 April 2007. At the close of the tender offer, ABN AMRO had obtained a 96.17% stake in Prime Bank. ABN AMRO was already the third-largest foreign bank in Pakistan. The acquisition will add significant scale to ABN AMRO's franchise in Pakistan, making the combined entity the second largest foreign bank and one of the top 10 banks in the country with assets of PKR 124 bln (EUR 1,547 mln) and over 80 branches.

EXHIBIT F-003

# EXHIBIT G

ABN AMRO's Press Release Dated July 31, 2006


**ABN·AMRO**

Further information can be obtained from:
Press Relations:    +31 20 628 8900
Investor Relations: +31 20 628 7835

This press release is also available on the
internet: www.abnamro.com

## IR / Press Release

**Amsterdam, 31 July 2006**

**ABN AMRO reports first half 2006 results:**
**Profit for the period up 17.7% compared with first half of 2005**

- **Operating result up 26.7% in first half due to consolidation of Banca Antonveneta, strong revenue growth in all BUs and gain on sale of K&H Bank**
  - Operating income up (+14.5% excluding, +23.7% including Banca Antonveneta) led by growth markets Latin America (+49.2%) and Asia (+30.0%)
  - Global Clients improves its revenues substantially in the second quarter
  - Improving operating performance at Banca Antonveneta, with second quarter operating profit before tax 17.2% higher than previous quarter (excluding purchase accounting impact)
  - Despite the fact that we are on track with regard to our cost savings programmes, the improvement of the efficiency ratio remains an absolute priority. We have therefore developed a number of additional cost initiatives for the second half of 2006
  - Interim dividend 2006 increased by 5 cents to 55 euro cents

- **Improved performances reflect impact of mid-market focus and new Group structure**
  - Improved results in most regional Client BUs reflect combination of the global product capabilities of Global Markets and the strengths of relationships with consumer and commercial clients in the regions
  - BU Netherlands results up as new service concepts and additional product capabilities continue to increase client satisfaction

- **Banca Antonveneta integration and new initiatives well on track**
  - Forecast synergies of EUR 160 mln by the end of 2007
  - Plans for introduction of new products, services and private banking initiatives underway

### Chairman's statement
"Our performance in the first half of 2006 reflects the initial benefits of making available the global product capabilities of the BU Global Markets to all our consumer and commercial clients in the regions, which led to a solid increase in revenues, continuing the positive momentum in revenue growth. For the second half of 2006, we will continue to work hard on realising all our stated priorities for the year. The successful execution of the management priorities so far, has generated a capital surplus which enables us to announce today a new share buy-back programme of EUR 750 mln, in addition to the EUR 600 mln share buy-back that we completed in the first half of this year. As indicated previously, we will also neutralise the 2006 interim stock dividend."

| (in millions of euros) | year to date [1] | | | | quarterly [1] | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2005 | % change [1] | % change [2] | Q2 2006 | Q1 2006 | % change [1] | % change [2] | | Q2 2005 | % change [1] | % change [2] |
| Total operating income | 11,484 | 9,281 | 23.7 | 20.3 | 5,841 | 5,643 | 3.5 | 5.6 | | 4,830 | 20.9 | 20.4 |
| Total operating expenses | 7,962 | 6,502 | 22.5 | 19.1 | 4,066 | 3,896 | 4.4 | 6.9 | | 3,406 | 19.4 | 19.3 |
| Operating result | 3,522 | 2,779 | 26.7 | 23.1 | 1,775 | 1,747 | 1.6 | 2.8 | | 1,424 | 24.6 | 23.2 |
| Loan impairment | 761 | 161 | | | 430 | 331 | 29.9 | 35.5 | | 62 | | |
| Operating profit before tax | 2,761 | 2,618 | 5.5 | 3.6 | 1,345 | 1,416 | (5.0) | (4.9) | | 1,362 | (1.2) | (1.8) |
| Profit for the period | 2,252 | 1,914 | 17.7 | 16.2 | 1,214 | 1,038 | 17.0 | 15.5 | | 994 | 22.1 | 18.0 |
| Net profit attributable to shareholders | 2,219 | 1,882 | 17.9 | 16.5 | 1,216 | 1,003 | 21.2 | 19.6 | | 987 | 23.2 | 19.1 |
| Earnings per share (euros) | 1.18 | 1.08 | 9.3 | | 0.65 | 0.53 | 22.6 | | | 0.54 | 20.4 | |
| | | | | | | | | | | | | |
| Efficiency ratio | 69.3% | 70.1% | | | 69.6% | 69.0% | | | | 70.5% | | |

1) all figures exclude the consolidation effect of controlled non-financial investments (see annex 2)
2) % change at constant foreign exchange rates (see annex 2)

**The BU Global Clients**

| (in millions of euros) | year to date | | | | quarterly | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2005 | % change | % change[1] | Q2 2006 | Q1 2006 | % change | % change[1] | Q2 2005 | % change | % change[1] |
| Net interest income | 290 | 348 | (16.7) | (18.8) | 135 | 155 | (12.9) | (11.1) | 182 | (25.8) | (26.0) |
| Net commissions | 538 | 401 | 34.2 | 32.3 | 315 | 223 | 41.3 | 44.2 | 221 | 42.5 | 44.0 |
| Net trading income | 293 | 300 | (2.3) | (2.1) | 152 | 141 | 7.8 | 8.7 | 143 | 6.3 | 7.2 |
| Other operating income | (11) | 10 | | | 37 | (48) | | | 8 | | |
| Total operating income | 1,110 | 1,059 | 4.8 | 3.6 | 639 | 471 | 35.7 | 38.1 | 554 | 15.3 | 16.1 |
| Total operating expenses | 957 | 843 | 13.5 | 12.6 | 516 | 441 | 17.0 | 19.1 | 398 | 29.6 | 30.8 |
| Operating result | 153 | 216 | (29.2) | (31.2) | 123 | 30 | | | 156 | (21.2) | (20.8) |
| Loan impairment | (5) | (43) | | | (3) | (2) | | | (38) | | |
| Operating profit before tax | 158 | 259 | (39.0) | (40.8) | 126 | 32 | | | 194 | (35.1) | (34.9) |
| Income tax expense | (6) | 46 | | | 4 | (10) | | | 40 | (90.0) | (89.3) |
| Profit for the period | 164 | 213 | (23.0) | (24.5) | 122 | 42 | 190.5 | 194.3 | 154 | (20.8) | (20.8) |
| Efficiency ratio | 86.2% | 79.6% | | | 80.8% | 93.6% | | | 71.8% | | |

1) all figures exclude the consolidation effect of controlled non-financial investments (see annex 2)
2) % change at constant foreign exchange rates (see annex 2)

| (in billions of euros) | 30 Jun 06 | 31 Dec 05 | % change | | 31 Mar 06 | % change |
|---|---|---|---|---|---|---|
| Total assets | 63.3 | 54.6 | 15.9 | | 63.6 | (0.5) |
| Risk-weighted assets | 26.5 | 26.2 | 1.1 | | 28.0 | (5.4) |

The BU Global Clients serves a group of clients who demand the most sophisticated financial solutions customised to their specific needs. They are attracted to ABN AMRO by the industry expertise of the global network of bankers in the BU Global Clients who can deliver these solutions by accessing both the ABN AMRO network and the broad range of products across the Group's portfolio. The product innovation and accumulated experience that result from working with these clients actively drives development of high-quality solutions for all clients of the bank, both within the BU Global Clients and within the regional BUs. The four client industry groups served are Financial Institutions & Public Sector (FIPS); Technology, Media & Telecommunications (TMT); Energy & Resources (E&R) and Global Industries (including Automotive, Consumer and Global Industrials). FIPS is the largest industry group, generating approximately half of the revenues in the BU Global Clients.

The breakdown of revenues of the BU Global Clients is approximately one third from Mergers & Acquisitions, Fixed Income Capital Markets (FICM), Equity Capital Markets, structured lending and merchant banking; one third from equities, derivatives, fixed income and foreign exchange; and one third from loan products and transaction banking. In the first half of 2006, approximately 60% of the revenues in the BU Global Clients were Global Markets revenues.

The half year-on-half year and the quarter-on-quarter comparisons below are impacted by the Services restructuring charge as well as the fair-market value adjustments of the stake in KEB, which was transferred from the BU Private Equity to the BU Global Clients on 1 January 2006. The Services restructuring charge of EUR 19 mln pre-tax (EUR 14 mln net), was booked in the second quarter of 2006. The fair-market value adjustments for KEB made at the end of every quarter in operating income and profit for the period were a negative EUR 15 mln in the first half of 2005, a negative EUR 24 mln in the first quarter of 2006 and EUR 4 mln in the second quarter of 2006.

**First half 2006 compared with first half 2005**

- *Total operating income* increased by 4.8% to EUR 1,110 mln due to growth in all industry groups. It should be noted that as of the second half of 2005 the BU Global Clients managed its credit portfolio more actively, in line with the Group's strategy to manage the balance sheet more actively, by means of hedging, securitisations and loan sales. Costs associated with these types of transactions are booked as a net charge to operating income.

  From a client group perspective, the performance was driven predominantly by growth in FIPS and TMT. The most recent deals are mentioned in the quarter-on-quarter comparison.

  From a product perspective, operating income growth was predominantly driven by structured lending and FICM, particularly in the TMT and the Global Industries (GI) industry groups, as well as growth in both equities and derivatives products.

- *Total operating expenses* increased by 13.5%. Excluding the Services restructuring charge of EUR 19 mln, total operating expenses were up 11.3% as the expense level in the second quarter of 2005 was very low (followed by a higher level of expenses in the third quarter of 2005). This increase is mainly due to an increase in costs for compliance, Sarbanes-Oxley and Basel II.

31

EXHIBIT G–002

- *The operating result* decreased by 29.2%. Excluding the KEB fair-market value adjustment and the restructuring costs, the operating result decreased by 16.9% mainly due to the increased hedging costs and the very low expense level in the second quarter of 2005.

- *Loan impairments* showed a release of EUR 5 mln, as no large write-backs occurred.

- A number of client-driven transactions with positive tax implications resulted in a net *tax credit* of EUR 6 mln.

- *Profit for the period* decreased by 23.0% to EUR 164 mln. Excluding the KEB fair-market value adjustment and the restructuring charge, profit for the period declined by 13.2%.

**Second quarter 2006 compared to first quarter 2006**

- *Total operating income* increased by 35.7% following a seasonally weak first quarter, as a number of large deals were executed in the second quarter. Excluding the fair-market value adjustment of KEB, total operating income improved 28.3%.

  From a client group perspective operating income growth was driven by TMT and FIPS. In TMT we advised Valcon Acquisition B.V. on their recommended public offer for VNU, a public-to-private transaction in Europe with an enterprise value of EUR 8.7 bln. We were sole financial adviser to Apax Partners in their EUR 1.3 bln acquisition of the German operations of Versatel. In FIPS we acted as the joint bookrunner in the EUR 1.2 bln Initial Public Offer (IPO) of SNS Reaal, and for American International Group Inc. we priced both a EUR 500 mln, 5-year offering and a EUR 750 mln, 10-year offering. We also were joint lead in the successful launch of a EUR 1.5 bln, 15-year covered bond for Abbey National plc. In E&R we advised Severstal on its proposed EUR 13 bln merger with Arcelor, and in GI we advised Carrefour on the sale of their Korean operations to E-Land Group.

  From a product perspective, operating income growth was predominantly driven by structured lending on the back of a number of transactions in the TMT and E&R sectors. In addition, Equity Capital Markets (ECM) revenues benefited from the IPO of SNS Reaal. Revenues also increased from the delivery of structured derivatives as well as plain vanilla products to clients.

- *Total operating expenses* increased by 17.0%. Excluding the restructuring charge, operating expenses were up 12.7%. This should be viewed against an operating income growth of 35.7%.

- *The operating result* increased EUR 93 mln to EUR 123 mln. Excluding the KEB fair-market value adjustment and the restructuring charge, the operating result improved from EUR 54 mln to EUR 138 mln, resulting in an improvement in the efficiency ratio from 89.1% to 78.3%.

- *Loan impairments* were almost unchanged, reflecting the high quality of the loan portfolio.

- *Profit for the period* rose by EUR 80 mln to EUR 122 mln. Excluding the KEB fair-market value adjustment and the restructuring charge, profit for the period doubled to EUR 132 mln.

  As mentioned in the first quarter, the activities of the BU Global Clients have a strong seasonal character. The first and the third quarter are usually the slowest quarters of the year, whereas the second and the fourth quarter are usually the best of the year. A strong pipeline for the second half has been built up in the first half of the year.

- The BU Global Clients continued to operate below 10% of Group RWA.

.

EXHIBIT G-003

# EXHIBIT H

Thomson Financial's Funds/Portfolio Report

# Thomson Financial
## Venture Economics' Venture Capital Financings
### Funds/Portfolio Report

**FUND NAME:**

**Address:**
FI Equity Partners BV
ITO Tower, 21st and 22nd Floor
Gustav Mahlerplein 106
Amsterdam, Netherlands 1082
31-20-383-1808
31-20-383-9703

**Last Updated:** Jun 11 2008
**Founding Date:** Jan 1 2003
**First Close Date:**
**Fund Size($Mil):** 0.0

**Phone:**

**Fax:**

**Web Site:**

**Fund Type:** Direct Investor-Investment/Merchant
Bank

**Investment Type:** Generalist Private Equity

**Stage Focus:** Generalist PE

**Founded:** Jan 1 1980

**Membership Affiliation:**
British Venture Capital Association
Dutch Venture Capital Association
European Venture Capital Association (EVCA)
French Venture Capital Association
German Venture Capital Association
Hong Kong Venture Capital Association (HKVCA)
Hungarian Venture Capital Association
Indian Venture Capital Association (IVCA)
Italian Venture Capital Association

**Executives:**

| First Name | Last Name | Job Title |
|------------|-----------|-----------|
| Dominique | Agrech | Manager |
| Gian | Argenziano | Partner |
| Jose | Basabe | Executive Officer |
| Bart | Bergstein | Executive Director |
| Hector-Perez | Berjano | Assistant Director |
| Dancker | Bijleveld | Executive Officer |

EXHIBIT H-001

**Thomson Financial**
**Venture Economics' Venture Capital Financings**
**Funds/Portfolio Report**

| | | |
|---|---|---|
| Johan | Bjurstrom | Managing Partner |
| Jonathan | Bourn | Director |
| Patrick | Bulmer | Executive Officer |
| Emmy | Catarinella | Executive Officer |
| Herve | Claquin | Managing Partner |
| Dominic | Collier | Executive Officer |
| Antonio | Corbani | Partner |
| Xavier | Cottin | Executive Officer |
| Pieter | Davidzon | Partner |
| Anne | Degeest | Investment Manager |
| Henk | Droge | Partner |
| Thomas | Eklund | Director |
| Paul | Folta | Representative |
| Soulaimene | Ftouh | Executive Officer |
| Yonel | Genin | Executive Officer |
| Andras | Geszti | Executive Officer |
| Carlos | Godina | Executive Officer |
| Ole | Hauskov | Director |
| Simon | Havers | Executive Officer |
| Berjano | Hector Perez | Assistant Director |
| Bert | Hildebrand | Executive Officer |
| Bruno | Houette | Associate Director |
| Thomas | Howells | Executive Officer |
| Mariann | Ivanics | Executive Officer |
| Gijs | Jeuken | Director |
| Christophe | Karvelis | Partner |
| ████ | ████████ | ███████ |
| Hugo | Kooiman | Investment Manager |
| Bob | Kramer | Managing Director |
| Gerber | Kuijper | Chairman |
| Raymond | Lo | Executive Officer |
| Gabe | Marino | Partner |

EXHIBIT H-002

**Thomson Financial**
**Venture Economics' Venture Capital Financings**
Funds/Portfolio Report

| Roger | Marshall | Managing Director |
|---|---|---|
| Sasja | McCann | Marketing |
| Olivier | Moatti | Investment Director |
| Bert | Mol | Partner |
| Paul | Moxon | Director |
| Andrew | Moye | Director |
| Andrea | Mugnai | Executive Officer |
| Geert-Jan | Mulder | Vice President |
| Christof | Namenyi | Partner |
| Olivier | Nemsguern | Executive Officer |
| Gerald | Oertel | Executive Officer |
| Andrea | Oosterdiek | Executive Officer |
| Carole | Ozille | Executive Officer |
| Francesco | Pamflio | Partner |
| Machiel | Papousek | Executive Director |
| Wolfgang | Pietzsch | Partner |
| Veronique | Pollicard | Executive Officer |
| Roger | Price | Executive Officer |
| Florent | Rey | Investment Manager |
| Gilles | Roland | Executive Officer |
| Bernard-Louis | Roques | Executive Officer |
| Nicolas | Rose | Partner |
| Floris | Roskam | Executive Officer |
| Kristofer | Runnquist | Executive Officer |
| Roel | Schoemaker | Executive Officer |
| Sander | Slootweg | Director |
| Bart | Sonck | Managing Director |
| Ftouh | Soulaimene | Executive Officer |
| Paul | Southwell | Managing Partner |
| Marc | Staal | Managing Partner |
| Jan | Stolker | Partner |
| Francine | Stourdze | General Manager |

EXHIBIT H−003

# Thomson Financial
## Venture Economics' Venture Capital Financings
### Funds/Portfolio Report

| | | |
|---|---|---|
| Alois | Strnad | Executive Officer |
| Peter | Tanczos | Executive Officer |
| Ian | Taylor | Managing Partner |
| Bruce | Thomson | Director |
| Frank | Trijbels | Investment Manager |
| Simon | Tuttle | Executive Officer |
| Johan | Tytgat | Executive Officer |
| Cor | Van 't Spijker | Partner |
| T | Van Der Graff | Executive Officer |
| Sander | Van Deventer | Executive Officer |
| Paul | Van Neerven | Executive Officer |
| Arnold | Van Os | Director |
| Martien | Van Osch | Director |
| Thijs | Van Pesch | CFO & COO |
| Wouter | Vander Veen | Partner |
| Luc | Verhoeven | Executive Officer |
| Geoffrey | Vero | Executive Officer |
| Patrice | Verrier | Associate Director |
| Veronique | Vincent | Investment Director |
| Tommy | Wikstrom | Analyst |
| Donald | Willenborg | Partner |
| Wolf | Wolfsteiner | Executive Officer |
| Betty | Wong | Director |

## Other Funds Managed:
**Fund Name:**
ABN AMRO Capital 2001
ABN AMRO Capital B FCPR 2001
ABN AMRO Causeway Mezzanine Partnership
ABN AMRO Corporate Investments - Unspecified Fund
ABN AMRO LBO Fund, The
ABN AMRO Mezzanine Partnership Fund II

EXHIBIT H-004

# Thomson Financial
## Venture Economics' Venture Capital Financings
### Funds/Portfolio Report

ABN AMRO Participates BV
ABN AMRO Ventures BV
ABN-AMRO Bank Funds
Causeway Development Capital Fund, The
Causeway Smaller Quoted Companies Fund
Fifth ABN-AMRO Causeway Development Capital Fund
Fourth Causeway Development Capital Fund, The
Health Innovation Fund
Placement Actions Developpement I
Placement Continuite
Second Causeway Development Capital Fund, The
Second Causeway Smaller Quoted Companies Fund
Third Causeway Development Capital Fund, The
Undisclosed Fund

## FUND INVESTMENTS:

| Portfolio Company | Round Date | Round Amount ($000) |
|---|---|---|
| **Amsterdam Molecular Therapeutics (AMT) Holding B.V.** | Oct 4 2006 | 0.0 |
| Location: | Amsterdam, ZF 1100 DA | |
| Business: | Develops gene-based therapies for orphan metabolic and ocular diseases. | |
| Stage at Investment: | Expansion | |
| **Argenta Discovery, Ltd. (FKA: ChemMedICa)** | Oct 13 2004 | Amsterdam, ZF 1100 DA |
| Location: | Essex, ZF CM19 5TR | |
| Business: | Provides solutions to drug discovery research. | |
| Stage at Investment: | Expansion | |
| **Cytheris SA** | Oct 26 2006 | Essex, ZF CM19 5TR |
| Location: | Issy les Moulineaux, 23 92130 | |

EXHIBIT H-005

# Thomson Financial
## Venture Economics' Venture Capital Financings
Funds/Portfolio Report

| | | |
|---|---|---|
| **Business:** | Develops immune growth products for the immune reconstitution field. | |
| **Stage at Investment:** | Expansion | |
| | | |
| ***GFKL Financial Services AG*** | | Issy les Moulineaux, 23 92130 |
| **Location:** | Essen, ZF D-45127 | |
| **Business:** | Operates a leasing and outsourcing business. | |
| **Stage at Investment:** | Acquisition | Dec 28 2004 |
| | | |
| ***PanGenetics BV*** | | Essen, ZF D-45127 |
| **Location:** | Utrecht, ZF 3584 CM | |
| **Business:** | Develops monoclonal antibodies for treatment of immune mediated diseases. | |
| **Stage at Investment:** | Startup | Mar 27 2006 |
| | | |
| ***Santaris Pharma (FKA:*** | | Utrecht, ZF 3584 CM |
| ***Pantheco & Cureon)*** | | |
| **Location:** | Horsholm, ZF 2970 | |
| **Business:** | Develops pharmaceuticals for the treatment of cancer. | |
| **Stage at Investment:** | Expansion | Dec 31 2005 |
| | | |
| ***Volution Holdings, Ltd. (AKA:*** | | Horsholm, ZF 2970 |
| ***Vent-Axia)*** | | |
| **Location:** | Crawley, ZF RH10 9YX | |
| **Business:** | Operates as a holding company. | |
| **Stage at Investment:** | Acq. for Expansion | Jun 6 2007 |

Copyright 2008 Thomson Reuters

EXHIBIT H−006

# EXHIBIT I

News Articles in Korean Language Regarding Total Companies

회사소개  광고문의  인터넷서비스운의  제휴문의  구독신청    [검색어를 입력해주세요]  🔍    아이디 [      ]  패스워드 [      ]  로그인  회원가입



**SUNDAY** Journal    언제 어디서나 한미 모바일 뱅킹    Ⓗ Hanmi Bank

홈    정치    경제    사회    로컬    문화    연예/스포츠    와이드특집    칼럼 ▾    열린마당 ▾

Home / 로컬 / 하기환씨(외환은행) 1백만불 물밑협상 가동중 하씨 「제의」에 외환 …

전자신문 보기

# 하기환씨(외환은행) 1백만불 물밑협상 가동중 하씨 「제의」에 외환 …

이 뉴스를 공유하기    Share 0    Tweet

Vol.422 | Posted on August 28, 2003 by secureadmin in 로컬



본보는 지난 403호 복간과 함께 제26대 LA 한인회 하기환 회장의 채권 환수소송과 관련해 4 차례에 걸쳐 집중적으로 기사화한 바 있다. 이러한 하 회장의 채권 환수소송과 관련해 최근 양자간의 합의냐, 아니면 하 회장의 의도적 제2차 파산이냐의 갈림길에서 채권자인 본국 외환은행(K.E.B), 채무자인 하기환 씨, 그리고 채권 추심회사인 'TOTAL Companies' 조셉 한(한국명 한영준) 대표간의 의견조율이 한창인 것으로 알려져 그 내막을 다시 집중적으로 살펴보겠다.

본보가 전격 제기했던 '하기환 금융 GATE'는 지난 1989년 하기환 씨가 공동투자자 3명(H모씨, O모씨, C모씨)과 함께 윌셔 블루바드 3807번지 빌딩 구입명목으로 본국의 외환은행(K.E.B)으로부터 대출 받은 1,800만 달러 중 회수하지 못한 660만 달러라는 거액에 대해 진행 중인 채무환수 소송에서 LA 수퍼리어 코트가 지난 2월 원고인 한국 외환은행(K.E.B)의 손을 들어 준 것에 대한 내용을 취재하면 과정에서 제기했던 사항이다.

하 회장을 어느 정도 아는 사람이라면 '소문난 알부자' 하기환 씨가 법률적으로 미국 내 재산이 단 한푼도 없다는 사실은 믿기 어렵다는 지적이다. 본보의 집중 기사가 나간 뒤 본국 외환은행(K.E.B) 측도 이러한 점을 고려해 리서치 기관을 통해 새로운 차압을 위한 하 씨의 재산을 집중 조사했으나 그 어떤 재산의 흔적도 찾아낼 수 없었다는 후문.

한편 채권 환수소송 당시 원고 죽은 법원으로부터 '하 회장 일가명의의 소유주식을 LA 카운티 압류 오피서에 양도하라'는 법원 명령을 받아 내게 되었고, 이는 본국 외환은행(K.E.B)이 선정한 채권 추심회사인 'TOTAL Companies'(대표 조셉 한)가 금년 1월 16일 법원에 접수시킨 채권환수 소송신청에 따른 명령이 내려졌던 것이었다.

이러한 1,323만 달러가 넘는 하 씨의 채무와 관련, 현재 하기환 씨는 합의를 볼 것이냐, 여의치 않으면 또 다시 파산신청을 할 것이냐를 놓고 저울질 중인 것으로 알려졌다. 한 제보자에 의하면 하기환 씨는 지난 90년대 초반 챕터 7 파산신청을 한 것으로 알려졌고, 유예 기간인 7년이 지남에 따라 최근 신용 등이 살아난 것으로 알려졌다. 상황이 이렇다 보니 또 다시 채무와 관련해 시시비비(是是非非)를 가릴 상황이 되자 '굴치(?)가 아픈 채무문제'를 적정선에서 합의를 도출해 해결할 것이냐 아니면 또 다시 제2차 파산신청을 통해 피해갈 것이냐를 고민 중이라는 것이다.

본보가 집중 기사화했듯이 하기환 씨의 채권환수를 담당하고 있는 채권 추심회사인 'TOTAL Companies'의 대표 조셉 한 씨는 하기환 씨와 고등학교 동기동창으로 최근 이들 두 사람의 의견조율이 한창이라는 소문이 타운 내 파다하다.

[본보 취재팀]

**하씨 "협상 안되면 파산 수순 또 밟을 지도"**

## 정치



'조국-윤미향' 부실검증 걸 다르고 속 다른 이중성 도마 위

검찰 칼잡이 최재경 전 민정수석, 그만두고 그동안 뭐하고

장하원펀드, '윤지미' 부실펀드 투자 '투자 전부터 이미 부실'



장하성 동생 장하원 부실펀드 판매 기업은행이 빠져나갈 수

## 경제



NOAH BANK

은행 "숨긴 재산 못찾아 이러지도 저러지도"

채권추심사와 1백만불 +α 모종의 뒷거래 했도 들러나와

### 채권환수 소송의 진행상황

금년 2월 채무자 하기환 씨를 상대로 본국 외환은행(K.E.B.)이 제기한 채권 환수소송에서 LA 수퍼리어 코트의 머레이 그로스 커미셔너는 하기환 씨가 1993년 7월 21일자로 쪽 아일랜드의 오프쇼어 신탁방식 '하 패밀리 일페퍼블 트러스트(Ha Family Irrevocable Trust)'라는 가족 신탁계좌를 통해서 보유하고 있는 일가족의 소유주식 가운데 한남체인 등의 주식들을 명령서 받은 날짜로부터 5일 이내에 LA 카운티 압류 오피서에 양도할 것을 명령했다. 하지만 하 회장은 쪽 아일랜드 신탁계좌에 들어있는 주식들은 차압대상에 포함되지 않는다고 주장하며 항소한 상태이고, 현재 이 사안은 아직 법원에 계류 중인 상태다.

■ 한국 프로퍼티 매니지먼트 주식 3,000주 (총 3,030주)
■ 한남체인 USA 주식 9,000주 (총 21,500주)
■ 트랜스 한남체인 주식 9,000주 (총 18,000주)
■ 수패 1 한남 주식 500주 (총 2,000주)
■ 주간현대 46,500주 (총 93,000주)

금년 1월 16일 법원에 접수된 채무관련 판결집행 영장(Writ of Execution)을 살펴보면, 원고 측은 하기환 회장과 그의 부인 하경희 씨의 채무원액이 그간의 이자 등을 포함해서 1,323만 달러를 넘어선 것으로 책정하고 법원에 채무 환수소송을 신청한 상태이다.

현재 하기환 씨는 원고 측이 주장하고 있는 1,300만 달러 이상은 너무 많은 과대책정 금액으로 자체 판단하고 있고, 일정부분 의견이 조율 된다면 합의를 볼 의사가 있음을 내비쳤다고 한 측근은 전했다.

하기환 씨는 합의금으로 1백만 달러 정도를 생각하고 있는 것으로 알려졌으나, 본국 외환은행 측은 이러한 금액은 합의할 수 없는 것으로 못박고 평평히 맞서고 있는 것으로 알려졌다. 본국 외환은행 또한 난처한 상황인 것은 이곳 LA에 파견된 외환은행 LA Agency가 실무를 맡아왔고, 10여 년 넘게 너무 오랜 기간동안 채무를 환수하지 못한 상태에서 적은 금액으로 합의를 볼 경우 본국으로부터 연대책임을 물을 가능성이 많기에 이러지도 저러지도 못하는 상황이란 것이다.

본국 외환은행 한 관계자에 따르면, "실제 채무가 600만 달러가 넘고, 이자 등 제반비용을 포함해 1,300만 달러가 넘는 채무를 환수함에 있어 100만 달러라는 쌈지돈으로 합의를 본다는 것은 어불성설이다. 우리는 일부자 하기환 회장의 재산을 계속 추적 중이다"라고 밝혔다.

### 해외은닉 재산에 대한
### 회수진행 및 항소심 진행

하기환 씨는 한국 외환은행으로부터 채무이행 소송이 제기된 지 불과 한달 만에 재산의 대부분의 주식을 빼고도 먼(?) 남태평양 금융기관 쪽 아일랜드에 신탁계좌를 개설해 옮겨 놓았었다. 어느 정도 채무와 관련한 귀뜸은(?) 싸움을 예상하고 있었고, 감지하고 있었다는 얘기다. 하기환 씨가 '외국자치령에 개설한 신탁계좌'란 일반적으로 자산동결에 대한 보호를 받기 위한 수단으로 사용되어 지는 것이다. 이렇듯 철저한 준비 속에 재산을 은닉해 놓았있지만, 이유야 어쨌든 간에 법원은 이들 해외계좌에 있는 주식들을 양도하라는 명령을 내린 것이다.

이 채무 환수소송 과정을 심층 취재하던 본보 취재팀은 하기환 LA 한인회장이 다른 세 명의 공동 투자자와 함께 1993년부터 대출과 관련한 한국 외환은행(K.E.B)과의 10년간에 걸친 지루한(?) 소송-Case No. BC 093516을 진행해 왔음을 밝힌 바 있다. 이렇듯 외환은행과 하기환 씨 모두 비싼 변호사비를 대가며 서로 지쳐있을 것이다.

본국 외환은행 측은 결국 지난 2000년 전문채권 추심사인 'Total Companies'사(대표 조셉 한)를 선정하였고, 추심사 선정 이후 하기환 씨의 채무환수와 관련한 모든 진행상황은 계약 하에 'Total Companies'사가 일괄처리하고 있는 실정이다.



FDIC 1분기 보고서 뜯어보니…

지난해 2분기 보고서 4070만 달러 부실 따른 수익 감소 파

지난해 한인은행 SBA 6% 급감 한인경제 뒷걸음질 '우려가

'눈감고 심사하나?' 구멍 뚫린 한인은행 SBA대출심사

사회



SK, 캘리포니아주에서도 기름값 담합 반독점법위반 혐의로

LA시의회, 뇌물 비리로 만신창 다운타운 개발 둘러싼 금품

장하성동생펀드, 포워드 파이낸싱 알고 봤더니 고리 일수놀

미국 "봉쇄령"은 정당성 논란…오늘의 사태 책임질 사람

로컬



이수혁 주미대사내정자 아그레망 받지 못하는 까닭은?

뉴스타 부동산 남문기 회장, 불굴의 투지로 간암을 이기다

새역사를 창조한 시간들, "코리아타운 빅토리!!"

한인여성 최초 미연방의원 탄생 기대주 영김후보, 미셸 박

이 과정에서 최근 또 다시 항간에 루머가 떠돌고 있다. "동기 동창생인 'Total Companies' 사 조셉 한 대표와 하기환 씨 간의 새로운 딜이 시작되었다"는 내용의 루머인 것이다.

하기환 씨는 현재 100만 달러에 합의를 볼 것을 기대하고 있으나, 조셉 한 씨는 100만 달러+α(비자금)를 요구하고 있다는 것이다.

(여기에서 α (비자금)이란 외환은행 모르게 오갈 수 있는 돈을 의미한다.) 들리는 바에 의하면, 하 씨는 200만 달러까지의 합의금까지도 고려 중이라는 후문.

### 進退兩難에 빠진 외환은행

본보가 밝힌 대로 '하기환 Case'는 지난 2000년 3월 김영진 당시 한국 외환은행(K.E.B) 지점장이 'Total Com-panies' 사와 맺은 20건의 해외부실 채권 환수계약 내에 포함되어 있던 Case중 한 건 이다.

대출과 관련한 모든 키를 조셉 한 씨가 이미 전권을 가지고 있다고 해도 과언이 아니기에 하기환, 조셉 한 두 동창생간의 모종의 딜이 진행되고 있다는 루머가 현실화될 수 있음을 의미한다.

외환은행 측은 현재 진퇴양난(進退兩難)에 빠졌다.
하기환 씨와 합의를 보자니 그 금액이 작고, 알려진 대로 하 씨가 또 다시 파산의 길을 선택한다면 채무 환수소송은 또 다시 새로운 국면에 빠져들기 때문이다.

이미 언급한대로 외환은행 측은 하기환 씨가 살고 있는 파사디나 주택 등 하 씨의 재산을 토대로 리서치 기관에 의뢰해 조사를 펼쳤으나, 미국 내에는 그 어떤 재산도 하기환 씨 명의로 되어있는 것이 없었다고 한다.
이런 무일푼의 하기환 씨가 최근 합의를 보자고 나섰다. 법적으로는 무일푼인 하기환 씨가 100만 -200만 달러에 달하는 거액의 합의금을 제시하고 나선 것으로 보인다.

'받자니 그 금액이 너무 적고, 안 받자니 파산이 걱정되고'. 본국 외환은행(K.E.B)은 '계륵(鷄肋)'을 먹을지, 말지 고민에 빠져 들었다.

[계륵(鷄肋) : 닭의 갈비뼈는 먹을 것은 없으나 그래도 버리기는 아깝다는 뜻에서, 무엇을 취해 보아도 이렇다 할 이익은 없지만 버리기는 아까움을 나타내는 고전적인 숙어이다.]

**본보에 폭언헤뎐**
**뉴스타 부동산 직원**
**자신 관련 제보 추궁하자**
**꼬리 내려**

○ … 노인회관 매각과 관련해 물의를 빚고있는 뉴스타 부동산과 남문기 대표에 관한 보도가 계속 되자 남문기대표의 측근 직원으로 알려진 K모씨는 본보에 전화를 걸어 '무슨 감정으로 계속 보도 를 하느냐/ 그 저의가 의심스럽고 광고가 필요하면 나한테 말하면 광고를 주겠다'고 불만을 토로.

시종일관 감정조로 일관, 폭언을 퍼부어대며 '신문도 아닌 신문에 보도돼 대꾸할 가치가 없다' '고 소를 하려고 해도 시간이 없다' '근거 없이 이렇게 써도 되느냐'며 일방적으로 10분간을 퍼부어대기도.

그러나 평소 K씨와 관련한 여러가지 불미스러운 제보가 있었던 지라 본지 기자가 K씨의 '언더테이블 머니'관계를 언급하자 슬그머니 꼬리를 내리기도.

본보에 제보된 K씨 관련 사항은 자신의 대 선배인 모씨에게 자신의 소유로 알려진 한인타운의 한 부동산을 지난 4월에 45만불에 매입 불과 5개월만에 87만불에 매각하면서 무려 15만불의 '언더테이블 머니'를 요구하는 이중적 행태의 장본인.

화가 난 K씨의 선배는 관계기관에 문제의 건물을 조회해 본 결과 1백년 가까이 된 주택을 허가도 받지않고 10개의 룸을 24개로 불법 개조, 기반 시설이 없어 자칫 붕괴위험까지 있는 건물이라는 사실을 알고는 매입을 포기. '선배까지 등쳐먹으려는 후배의 태도'에 분개하며 본보에 하소연.

(본보의 보도 저의가 알고 싶다는 K씨/ 그 저의는 바로 당신과 같은 피도 눈물도 없는 악덕 에이젠트들의 소행을 알려 선의의 피해자가 생기지 않게 하는 것이오)

**남문기씨 보도후 남은 발자취들**

◦ … 지난 5주간 '뉴스타 부동산' 남문기 대표를 기사화하면서 연일 웃지 못할 진풍경.
입에 담지 못할 폭언을 담은 협박성 전화로 인해 본보 전화라인 일시 마비.

남문기 씨에 대한 기막힌 사연을 구구절절 들려주는 제보, 본보 배포에 맞춰 등장한 본보 '수거댄(?)'에 대한 독자들의 기막힌 추격 제보 등 그저 웃고 말기에는 씁쓸함이 남는 지난 몇 주간의 발자취들.

[본보는 '남문기' 씨 개인을 위한 신문이 아니기에, 수많은 기사거리를 뒤로한 채 잠정적으로 기사를 마무리하기로 했소. 부디 정직하고 신용 있는 기업으로 거듭나 지면에서 좋은 모습으로 만나길 기대하겠소.]

**泮(부평초 평)統이 아니라**
**平和統일 위한 단체 되어야**

◦ … 11기 평통 회장인선부터 시작하여 임원진 선출까지 평통은 입방아를 자주 찧는 단체중 하나인데..
최근까지 본보는 진정한 平統으로 다시 태어나길 기대하며 간헐적으로 평통에 대해 기사화했지만 부평초와 같이 떠돌아 다니는 평통이 아니라 진정한 平統으로 거듭나기를 기대했던 것과는 달리 일명 "비판만 하는 기사"로 치부하며 "남들도 다 그렇게 해왔는데, 왜 나만 가지고 그래"식으로 평통회장은 불만 아닌 불만을 성토하고 있다는데…

부평초와 같이 떠돌며 감투하나 쓰게 되었다고 사방팔방 자랑만 하지 말고, 공부 좀 하면서 잘 좀 해주었으면 하는 님 향한 우리들의 바램을 님이 자꾸 몰라주고, 언론사가 평통(김광남회장) 때리기만 한다고 하면 나 어찌하리오.

진정코 언론이 평통(김광남회장)을 때리려고 한다면 이 정도로 하겠소? 님이여 제발 내 맘 좀 알아 주고, 泮統아닌 平統이 되도록 해주어소.

**'음주방송 이종환 씨' 보도에**
**모 방송사 주간지 싸잡아 비난**

◦ … 최근 모 라디오 방송의 한 진행자는 지역 주간지 기자(記者)들의 자질을 운운해 눈쌀.
내용인 즉 "일부 자격도 없는 기자(記者)들이 타운 내 물을 흐리고 있다"는 내용을 담은 다소 충격적인 발언. 과연 이 같은 발언을 하는 진행자 님(?)은 자격이 있는지 되묻고 싶소.

본국에서는 인터넷 뉴스 등을 통해 시민 기자(記者)들이 글을 쓰고 기사를 다루는 시대가 열린 마당에… 기자(記者)란 무엇인가? 단순히 살펴보면 '글 쓰는 이'인 것이다. 그 누가 글을 쓰고 방송을 하는 데 있어 따로 구분을 져 자격을 논하겠는가? 시대에 뒤떨어져도 한창 뒤떨어진 발상.

또한 이 같은 발언이 본보를 겨냥한 고의적 방송이 아니었나라는 제보가 본보에 잇따라… 최근 본보가 '음주방송 파문'을 일으킨 이종환 씨를 기사화하자 보복성 멘트를 지시 내린 것이 아니냐라는 추측성 제보. 또한 최근 본보가 집중 기사화하고 있는 '남문기' 씨가 그 날 그 방송국을 찾았다는데. 오비이락(烏飛梨落)일까? 역시 타운 내 최대 광고주의 힘이 세긴 세군.

[어차피 녹음방송. 차라리 지시를 내리려면 '폭언'의 대가 이종환 씨에게 부탁하지. 쯧쯧쯧, 그럼 모양새라도 났을텐데…]

**마켓 판매 횟감에서 바퀴벌레 출현, 화들짝**

◦ … 한인들이 좋아하는 술안주 중 하나가 바로 싱싱한 횟감. 이렇다 보니 저녁 시간이면 많은 한인 대형 마켓들에는 애주가들이 삼삼오오 모여들어 앞 다투어 진열장에 놓인 횟감을 사기위해 분

주. 하지만 이게 웬일. 최근 하절기 기간동안 대형마켓에서 저렴하게 판매하는 횟감을 사서 먹다가 그 안에서 바퀴벌레가 출현했다는데…

[ 마켓 주인님들! 위생에 신경 좀 써 주시죠. 애주가들은 옳니다. ]

**밥값 안받으면 되지**

o … 한인 H씨는 점심시간을 이용, 동료들과 함께 식사하던 중 배고팠던 탓에 허겁지겁 식사를 했으나 거의 다 먹을 무렵 하얀 국에서 동동 떠오는 것이 있어 유심히 살펴보니 이런 파리가 아니던가.

식사전에 발견이라도 했으면 다시 주문이라도 하겠건만… 거의 다 먹어 가는데 하필 그때 동동 떠다닐 것은 무엇인지. 주인에게 항의를 하자 주인은 미안하다는 말과 함께 "밥 값 안받으면 되지"라며 고객을 진정시켰으나, 고객의 더부룩하고 찜찜한 생각을 어이할까. 앞으로 조심합시다.

**본국 누드사진 열풍, LA 여성들도 가세**

o … 본국 연예인들을 주축으로 누드사진 촬영의 열풍이 거세게 불고 있는 가운데, 이곳 LA에도 누드열풍의 바람이 불고 있다는 기막힌 얘기.

연예인도 아닌 일반 여성들이 아무 꺼리낌 없이 젊은 시절의 한 추억의 사진을 남기기 위해 벗는 것을 주저 않는다니. 급변하는 세상에 장단 맞추기 참으로 힘들구료. 젊은 시절 아름다움을 사진으로 남기는 것도 좋겠지만, 급격하게 누드 문화를 받아서 쳬하지는 않을까 심히 걱정이구료.

®SundayJournalUSA (www.sundayjournalusa.com), 무단 전재 및 재배포 금지

이전
◀ 「갈때까지 갔다」 한인도박 「위험수위」        「국민회관」 기초 관리시급… '자료분실 위험'    다음 ▶

**이 뉴스를 공유하기**    Share 0    Tweet

선데이-핫이슈

'신라젠-라임자산운영' 주가조작에 문재인 정권 실세들 줄줄이 연루 의      '채용비리 잡겠다더니…' 신한 앞에서 작아지는 문재인 정부

'경희대 출신-부산파 인맥' 요직 장악한 그들의 위험한 질주      미국 보건당국 '독감 예방 주사 맞아라'

김승수, "지수원과 조만간 결혼할 생각이다"      남편을 뿅 가게하는 101 테크닉

30개주에서 독감 창궐 이미 2000명 이상사망

골프장섹스동영상 파문 SNS에 실린 기막힌 동영상을 보니…      윤석열 검찰총장 후보자의 숨겨진 과거와 흔적들 실체취재

감사원 감사보고서 뜯어보니…씁쓸하다 못해 참담하기까지

기자의 눈        와이드특집

Case 3:22-cv-01734-N-BH   Document 3   Filed 08/10/22   Page 58 of 78   PageID 62



EXHIBIT I-006

# 김재록씨 1999 년 행적..제기됐던 의혹들

김대중(金大中.DJ) 정부 시절 '금융계 마당발'로 불리며 금융당국에 대한 인수 청탁 등의
부탁과 함께 금품을 받은 혐의로 구속된 김재록씨를 둘러싼 의혹이 일파만파로 퍼지면서
김씨의 지난 1999 년 행적에도 관심이 쏠리고 있다.

당시 김씨가 부회장을 맡고 있던 투자컨설팅 업체 아더앤더슨사는 자산관리공사(자공)의
4 억 7 천 500 만달러 규모의 부실채권 매각을 위탁대행했지만, 이에 대한 특혜 의혹이 뒤늦게
불거지면서 한나라당 의원들이 2001~2002 년 국회 국정감사 등에서 집중적으로 문제를
제기한 것.

당시 국감 및 상임위 회의록에 따르면 정무위 소속의 이성헌(李性憲) 전 의원은 "자공이
당시 제일은행과 서울은행의 해외법인 소유 부실채권 매각을 위해 7 개 업체를 대상으로
공개입찰을 실시했지만, 실질적으로는 순위를 조작해 아더앤더슨이 낙찰됐고, 아더앤더슨은
이후 토털컴퍼니와 하도급 계약을 맺었다"면서 "항간에 떠돌던 자공과 특정업체간 검은
커넥션 관계가 드러난 것"이라고 주장했다.

그는 "아더앤더슨과 토털컴퍼니간 이익 배분 계약서에는 500 만달러 이상 계약시 3 대 7 로
이익을 배분하게 돼있다"면서 "매각대행사는 이름만 빌려주고 팔아서 나오는 모든 이익은
하청업체인 토털 컴퍼니가 먹게 돼있는 구조"라고 말했다.

그는 "미국 LA 에 본사를 둔 토털컴퍼니의 사장인 한영준씨가 자공의 부실채권 매각을
대행한 데는 한씨의 인척인 김봉자씨가 DJ 의 영부인인 이희호(李姬鎬) 여사와 관련돼
있다는 점을 주목해야 한다"면서 "이것이 중요한 연결고리가 돼 한씨는 이후
예금보험공사에서 약 8 억달러짜리 부실채권 매각을 수주했고, 1 억 2 천만불 규모의 상각채권
처리도 수주했다"고 강조했다.

그는 이어 "토털컴퍼니는 이 과정에서 '킥 백' 방식으로 5 천만달러의 돈을 빼돌려
LA 소재의 나라은행에서 자금운용을 하고 있고, 자공 부실채권 매각을 통해 역시 5 천만불
짜리 통장을 관리하고 있다고 알고 있다"면서 "이 일을 도모하기 위해 2000 년 6 월부터
2001 년 5 월까지 이형택 예보전무와 한영준씨, 정재룡 자공 사장, 김재록씨가 용인 소재
안가같은 한정식집에 수시로 모여 회의를 했다고 한다"고 주장했다.

이 전 의원은 또 "당시 아더앤더슨에는 DJ 의 처조카이자 예금보험공사 전무인 이형택씨의
동생으로 알려진 이정택씨가 고문으로 일하고 있었다"면서 "이것 역시 한영준씨, 김재록씨
그리고 자공의 정재룡 사장과 연결되는 인과관계의 고리를 설명하고 있는 것"이라고 말했다.

EXHIBIT I-007

그는 "감사원 기록에 따르면 허경만 자공 부사장이 제일·서울은행 부실채권 매각대행사 선정 과정에 깊숙이 관여했고, 아더앤더슨이 대행사로 선정된 후에 토털컴퍼니를 하도급업자로 선정하게 된 것은 김재록 아더앤더슨 부회장과의 관계에 의한 것임을 알 수 있다고 돼있다"고 덧붙였다.

법사위 소속 같은 당 최병국(崔炳國) 의원도 2002년 국정감사에서 "아더앤더슨이 자공과 매각대행 계약을 체결할 때 자산과 직원규모 요건을 모두 갖추지 못했다"면서 "이는 대통령 처조카인 이형택의 친동생인 이정택씨가 그 회사의 고문이어서 (계약)해줬다는 것이다. 그래서 특혜시비가 있는 것"이라고 주장한 것으로 드러났다.

이성헌 전 의원은 27일 연합뉴스와의 통화에서 "김재록씨가 부회장이던 아더앤더슨이 토털컴퍼니와 비상식적인 하청업체 계약을 맺어 거액의 이익을 몰아 준 것과 관련, 토털컴퍼니 사장인 한씨가 당시 정권의 최고 실세인 P씨와 연결됐기 때문이라는 제보가 있었다"면서 "이에 대해 더 파고들어야 했지만, 야당이라는 한계 때문에 별 성과를 보지 못했다"고 설명했다.

한편 한나라당은 김재록씨와 관련해 제기되는 의혹들을 규명하기 위해 진상조사단을 구성키로 했다.

서울=연합뉴스

입력 : 2006.03.27 21:13 39'

EXHIBIT I-008

한국경제

# `론스타 검은머리 외국인' 진위 가린다

입력 2006-04-10 07:06    수정 2006-04-10 07:06

론스타의 외환은행 매입과 재매각은 과연 `검은머리 외국인(黑髮外人)'이 짜놓은 각본에
따른 것일까.

외환은행 헐값 매각 문제가 뒤늦게 국민적 관심사로 떠오르면서 검찰과 정치권, 금융계
주변에서 갖가지 설(說)과 의혹들이 난무하고 있다.

검찰이 감사원과 함께 2003년 외환은행이 미국계 사모펀드 론스타에 팔리는 과정의 여러
의혹을 본격 수사키로 함에 따라 시중에 떠도는 이런 루머도 조만간 진위 가 가려질
것으로 보인다.

검찰 수사와 관련해 가장 관심을 끄는 소문은 `검은 머리 외국인'의 배후 조종설.
`검은 머리 외국인'이 모처에서 조성된 천문학적 액수의 자금을 론스타에 투자하고
론스타가 외환은행을 매입하도록 `보이지 않는 손'의 역할을 했다는 게 이런 추측의
골격이다.

이 과정에서 `검은 머리 외국인'이 론스타의 외환은행 매입이 수월하도록 제3자를 통해
관련 기관에 대한 로비를 계획하는 등 영향력을 행사했다는 주장도 그럴 듯하게 나돌고
있다.

`검은 머리 외국인'의 배후조종 의혹이 본격적으로 불거진 것은 한나라당 엄호성·이한구
의원이 외환은행 매각 의혹에 대한 재경위의 문서검증보고서를 채택한 금년 2월부터다.

당시 엄 의원 등은 "론스타의 외환은행 인수에 `검은 머리' 외국인이 개입됐다는 의혹이
있다.

한국인의 돈이 미국으로 빠져나가 단기차익을 노리고 다시 론스타 펀드에 들어갔다는

의혹이 제기되는 만큼 검찰 조사를 통해 자금의 출처를 역추적해 실체를 밝혀내야 한다"고 촉구했다.

일각에서는 김대중 정부 시절 유력 인사였던 P씨의 친척인 재미교포 A씨가 외환은행 매각 작업에 깊숙히 개입해 배후에서 조종한 `검은 머리 외국인'이라는 주장도 나온다.

1997년 외환위기 사태를 즈음해 김재록씨 등과 더불어 위상이 급부상한 A씨가 P씨 등의 지원을 받아 정권 실세와 친분을 쌓으며 외환은행 매각에 막강한 영향력을 행사했다는 게 이 소문의 내용이다.

`보이지 않는 손'이 정권의 고위 실세일 수도 있다는 주장도 있으나 어느 것 하나 똑부러진 근거는 없다는 게 시중에 떠도는 소문들의 공통점이다.

이런 추측들은 외환위기 직후 김대중 정부의 고위 관료들을 겨냥한 것들이 많아 `민주당 죽이기'를 위해 누군가 악의적으로 퍼뜨리고 있는 것 아니냐는 의구심도 적지 않다.

이같은 의혹들이 호사가들이 만들어낸 `소설' 수준에 불과한 것인지, 아니면 실제 근거와 논리를 갖고 있는 `의혹 제기'인지는 검찰 수사가 끝나야 정리가 될 것으로 보인다.

(서울연합뉴스) 조성현 기자 eyebrow76@yna.co.kr

EXHIBIT I-010

# EXHIBIT J

Tax Rerun Filed by Stanford University Trustees

| Form **990** | **Return of Organization Exempt From Income Tax** | OMB No. 1545-0047 |
|---|---|---|
| | Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation) | **2007** |
| Department of the Treasury Internal Revenue Service | ▶ The organization may have to use a copy of this return to satisfy state reporting requirements. | Open to Public Inspection |

**A** For the 2007 calendar year, or tax year beginning   09/01 , 2007, and ending   08/31/2008

**B** Check if applicable:
- Address change
- Name change
- Initial return
- Termination
- Amended return
- Application pending

**Please use IRS label or print or type. See Specific Instructions.**

**C** Name of organization STANFORD UNIVERSITY BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY

Number and street (or P.O. box if mail is not delivered to street address) 3145 PORTER DRIVE | Room/suite

City or town, state or country, and ZIP + 4 PALO ALTO, CA 94304

**D** Employer identification number 94-1156365

**E** Telephone number ( 650 ) 725-1732

**F** Accounting method:  Cash  X Accrual  Other (specify) ▶

● Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ).

**H** and **I** are not applicable to section 527 organizations.
- **H(a)** Is this a group return for affiliates?  Yes  X No
- **H(b)** If "Yes," enter number of affiliates ▶
- **H(c)** Are all affiliates included?  Yes  No (If "No," attach a list. See instructions.)
- **H(d)** Is this a separate return filed by an organization covered by a group ruling?  Yes  X No

**G** Website: ▶ WWW.STANFORD.EDU

**J** Organization type (check only one) ▶ X 501(c) ( 3 ) ◀ (insert no.)  4947(a)(1) or  527

**I** Group Exemption Number ▶

**K** Check here ▶ ☐ if the organization is not a 509(a)(3) supporting organization and its gross receipts are normally not more than $25,000. A return is not required, but if the organization chooses to file a return, be sure to file a complete return.

**M** Check ▶ ☐ if the organization is not required to attach Sch. B (Form 990, 990-EZ, or 990-PF).

**L** Gross receipts: Add lines 6b, 8b, 9b, and 10b to line 12 ▶   25,380,587,853.

## Part I  Revenue, Expenses, and Changes in Net Assets or Fund Balances (See the instructions.)

| | | | | Amount |
|---|---|---|---|---|
| **1** | Contributions, gifts, grants, and similar amounts received: | | | |
| **a** | Contributions to donor advised funds | **1a** | 126,803,885. | |
| **b** | Direct public support (not included on line 1a) | **1b** | 799,145,433. | |
| **c** | Indirect public support (not included on line 1a) | **1c** | | |
| **d** | Government contributions (grants) (not included on line 1a) | **1d** | 925,698,671. | |
| **e** | Total (add lines 1a through 1d) (cash $ 1,684,609,989. noncash $ 167,038,000. ) | | **1e** | 1,851,647,989. |
| **2** | Program service revenue including government fees and contracts (from Part VII, line 93) | | **2** | 1,453,912,797. |
| **3** | Membership dues and assessments | | **3** | |
| **4** | Interest on savings and temporary cash investments | | **4** | 19,166,944. |
| **5** | Dividends and interest from securities | | **5** | 174,135,860. |
| **6a** | Gross rents | **6a** | 84,496,594. | |
| **b** | Less: rental expenses | **6b** | 18,397,879. | |
| **c** | Net rental income or (loss). Subtract line 6b from line 6a | | **6c** | 66,098,715. |
| **7** | Other investment income (describe ▶ STMT 13 ) | | **7** | 79,825,590. |
| **8a** | Gross amount from sales of assets other than inventory | (A) Securities | (B) Other | |
| | | **8a** 21689812615. | 22,518,208. | |
| **b** | Less: cost or other basis and sales expenses | **8b** 20404665748. | 22,002,675. | |
| **c** | Gain or (loss) (attach schedule) | **8c** 1,285,146,867. | 515,533. | |
| **d** | Net gain or (loss). Combine line 8c, columns (A) and (B) | | **8d** | 1,285,662,400. |
| **9** | Special events and activities (attach schedule). If any amount is from gaming, check here ▶ ☐ | | | |
| **a** | Gross revenue (not including $ of contributions reported on line 1b) | **9a** | | |
| **b** | Less: direct expenses other than fundraising expenses | **9b** | | |
| **c** | Net income or (loss) from special events. Subtract line 9b from line 9a | | **9c** | |
| **10a** | Gross sales of inventory, less returns and allowances | **10a** | 5,071,256. | |
| **b** | Less: cost of goods sold | **10b** | 1,989,512. | |
| **c** | Gross profit or (loss) from sales of inventory (attach schedule). Subtract line 10b from line 10a | | **10c** | 3,081,744. |
| **11** | Other revenue (from Part VII, line 103) | | **11** | |
| **12** | **Total revenue.** Add lines 1e, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11 | | **12** | 4,933,532,039. |
| **13** | Program services (from line 44, column (B)) | | **13** | 3,051,908,819. |
| **14** | Management and general (from line 44, column (C)) | | **14** | 288,045,898. |
| **15** | Fundraising (from line 44, column (D)) | | **15** | 81,599,071. |
| **16** | Payments to affiliates (attach schedule) | | **16** | |
| **17** | **Total expenses.** Add lines 16 and 44, column (A) | | **17** | 3,421,553,788. |
| **18** | Excess or (deficit) for the year. Subtract line 17 from line 12 | | **18** | 1,511,978,251. |
| **19** | Net assets or fund balances at beginning of year (from line 73, column (A)) | | **19** | 21,957,428,008. |
| **20** | Other changes in net assets or fund balances (attach explanation) STMT 14 | | **20** | -778,778,922. |
| **21** | Net assets or fund balances at end of year. Combine lines 18, 19, and 20 | | **21** | 22,690,627,337. |

For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.

Form **990** (2007)

JSA
7E1010 2.000

01920M 7377

EXHIBIT J-001

STANFORD UNIVERSITY BOARD OF TRUSTEES

FORM 990, PART IX -

94-1156365

| NAME AND ADDRESS EMPLOYER IDENTIFICATION NUMBER | NATURE OF BUSINESS ACTIVITIES | TOTAL INCOME | ENDING ASSETS |
|---|---|---|---|
| ========================= | ----------------- | ----- | ----- |
| FAIRFIELD SPCTRM VAL VISTA, LP C/O SMC, 2770 SAND HILL ROAD MENLO PARK, CA 94025 20-2356060 | 60.000000 REAL ESTATE DEVELOPMENT | 33,400,034. | 398,779. |
| GAVEA INVESTMENT FUND II-C, LP C/O SMC, 2770 SAND HILL ROAD MENLO PARK, CA 94025 98-0537952 | 53.200000 INVESTMENTS | 10,035,864. | 135,112,000. |
| JER R.E. QUAL PRTNRS EURP, LP C/O SMC, 2770 SAND HILL ROAD MENLO PARK, CA 94025 54-2029560 | 99.000000 REAL ESTATE INVESTMENTS | 1,398,574. | 5,978,417. |
| JER ALBERTA, LP C/O SMC, 2770 SAND HILL ROAD MENLO PARK, CA 94025 00-0000000 | 100.000000 INVESTMENTS | -3,413,941. | 27,984,826. |
| JER ALBERTA III, LP C/O SMC, 2770 SAND HILL ROAD MENLO PARK, CA 94025 00-0000000 | 100.000000 REAL ESTATE INVESTMENTS | 159,490. | 17,734,424. |
| ████ 00-0000000 | ████ | | ████ |
| LINCOLN COMMERCE PARK II, LP | 70.000000 REAL ESTATE DEVELOPMENT | -1,237,645. | 23,105,764. |

01920M 7377

V07-8.7

STATEMENT 57

EXHIBIT J-002

Case 3:22-cv-01734-N-BH   Document 3   Filed 08/10/22   Page 66 of 78   PageID 79
94-1156365

```
FORM 990, PART XI - ███████████████████████████████████   CON
=================================================================
CONTROLLED ENTITY'S NAME:      FAIRFIELD SPECTRUM VAL VISTA, LP
CONTROLLED ENTITY'S ADDRESS: C/O SMC, 2770 SAND HILL ROAD
CITY, STATE & ZIP:             MENLO PARK, CA 94025
EIN:                           20-2356060
TRANSFER AMOUNT:                         215,346.
EXPLANATION OF TRANSFER FROM CONTROLLED ENTITY:
   DISTRIBUTION


CONTROLLED ENTITY'S NAME:      JER R.E. QUALIFIED PARTNERS EUROPE, LP
CONTROLLED ENTITY'S ADDRESS: C/O SMC, 2770 SAND HILL ROAD
CITY, STATE & ZIP:             MENLO PARK, CA 94025
EIN:                           54-2029560
TRANSFER AMOUNT:                         968,094.
EXPLANATION OF TRANSFER FROM CONTROLLED ENTITY:
   DISTRIBUTION


██████████████████████████    ████████████████████████████████
████████████████████████████████████████    ██████████████████
████████████████████████      ████████████████████████████
EIN:                           00-0000000
TRANSFER AMOUNT:                      15,044,155.
EXPLANATION OF TRANSFER FROM CONTROLLED ENTITY:
████████████████


CONTROLLED ENTITY'S NAME:      MARINER VOYAGER INTERNATIONAL, LTD
CONTROLLED ENTITY'S ADDRESS: C/O SMC, 2770 SAND HILL ROAD
CITY, STATE & ZIP:             MENLO PARK, CA 94025
EIN:                           00-0000000
TRANSFER AMOUNT:                       9,805,648.
EXPLANATION OF TRANSFER FROM CONTROLLED ENTITY:
   DISTRIBUTION


CONTROLLED ENTITY'S NAME:      NC-WC, LP
CONTROLLED ENTITY'S ADDRESS: C/O SMC, 2770 SAND HILL ROAD
CITY, STATE & ZIP:             MENLO PARK, CA 94025
EIN:                           81-0630891
TRANSFER AMOUNT:                       5,347,204.
EXPLANATION OF TRANSFER FROM CONTROLLED ENTITY:
   DISTRIBUTION
```

# EXHIBIT K

HSBC's Public Disclosure Dated September 3, 2007

*The Stock Exchange of Hong Kong Limited takes no responsibility for the contents of this announcement, makes no representation as to its accuracy or completeness and expressly disclaims any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this announcement. The ordinary shares of HSBC trade under stock code 5 on The Stock Exchange of Hong Kong Limited.*



## DISCLOSEABLE TRANSACTION
## HSBC AGREES TO ACQUIRE MAJORITY SHAREHOLDING IN KOREA EXCHANGE BANK

HSBC Holdings plc ("HSBC"), through its indirect, wholly-owned subsidiary, HSBC Asia Pacific Holdings (UK) Limited ("HSBC Asia"), has agreed to acquire 51.02 per cent of the issued share capital of Korea Exchange Bank ("KEB"), the sixth largest bank in Korea. The shares will be acquired from LSF-KEB Holdings SCA, a holding company owned by Lone Star Fund IV (US) LP and Lone Star Fund IV (Bermuda) LP (collectively "Lone Star"). The purchase price is KRW3,400 billion plus US$2,700 million amounting in total to the equivalent of approximately US$6,317 million, payable in cash, assuming the acquisition is completed on or before 31 January 2008. In the event that the acquisition is completed after 31 January 2008, the purchase price will be increased by US$133 million, also payable in cash.

The acquisition is subject to a number of conditions including the receipt of applicable governmental and regulatory approvals, particularly in Korea from the Financial Supervisory Commission ("FSC") and the Fair Trade Commission. In the event that the formal application for approval has not been submitted to the FSC on or before 31 January 2008, Lone Star has the right to terminate the acquisition agreement.

Under a shareholders' agreement with Lone Star, The Export-Import Bank of Korea ("KEXIM") is entitled to require HSBC Asia to purchase, on substantially the same terms, part or all of its shareholding in KEB (KEXIM's entire shareholding represents a further 6.25 per cent of KEB).

HSBC does not intend to make a tender offer to KEB's remaining shareholders and, following completion of the acquisition, KEB will remain a company listed on the Korea Exchange.

The acquisition will constitute a discloseable transaction for HSBC under the Hong Kong Listing Rules.

This announcement is being published pursuant to Rule 14.34 of the Hong Kong Listing Rules. A circular containing further information on the acquisition in accordance with the relevant requirements of the Hong Kong Listing Rules will be mailed to HSBC shareholders who have elected to receive corporate communications in printed form and will be available at the same time on HSBC's website, www.hsbc.com.

**THE ACQUISITION**

HSBC Holdings plc ("HSBC"), through its indirect, wholly-owned subsidiary, HSBC Asia Pacific Holdings (UK) Limited ("HSBC Asia"), has agreed to acquire 51.02 per cent of the issued share capital of Korea Exchange Bank ("KEB"), the sixth largest bank in Korea.

The shares will be acquired from LSF-KEB Holdings SCA, a holding company owned by Lone Star Fund IV (US) LP and Lone Star Fund IV (Bermuda) LP (collectively "Lone Star"). The purchase price is KRW3,400 billion plus US$2,700 million amounting in total to the equivalent

1
EXHIBIT K-001

of approximately US$6,317 million, payable in cash, assuming the acquisition is completed on or before 31 January 2008.

The acquisition is subject to a number of conditions including the receipt of applicable governmental and regulatory approvals, particularly in Korea from the Financial Supervisory Commission ("FSC") and the Fair Trade Commission. In the event that the acquisition is completed after 31 January 2008, the purchase price will be increased by US$133 million, also payable in cash.

Under a shareholders' agreement with Lone Star, The Export-Import Bank of Korea ("KEXIM") is entitled to require HSBC Asia to purchase, on substantially the same terms, part or all of its shareholding in KEB (KEXIM's entire shareholding represents a further 6.25 per cent of the issued share capital of KEB).

HSBC does not intend to make a tender offer to KEB's remaining shareholders and, following completion of the acquisition, KEB will remain a company listed on the Korea Exchange (the "KRX").

HSBC Group Chairman Stephen Green said, "Our stated strategy is to focus on expanding HSBC's presence in important growth economies, particularly in Asia, Latin America and the Middle East and to maintain our capital strength to allow us to take advantage of strategic opportunities. This prospective acquisition reflects that strategy.

It would provide HSBC with a significant presence in Asia's third-largest economy and reinforce our position as Asia's number one international bank.

HSBC has a long history in Korea. We are delighted with this prospective acquisition, which we believe would benefit the customers and staff of both KEB and HSBC."

**ACQUISITION AGREEMENT**

Under an agreement entered into on 3 September 2007 with Lone Star, HSBC Asia has conditionally agreed to purchase 329,042,672 KEB shares, representing 51.02 per cent of the issued share capital of KEB, from Lone Star.

***Conditions and termination right***

The acquisition is conditional upon the satisfaction or waiver of certain conditions on or before 30 April 2008 including (but not limited to):

- KEB, HSBC Asia and other relevant members of the HSBC Group having received all necessary governmental and regulatory approvals, particularly in Korea (and none of the approvals being granted subject to any conditions having adverse effect)

- no adverse effect having occurred in relation to KEB's business, assets, operations or liabilities that is material to the KEB Group taken as a whole (excluding the effects of changes in general economic, financial, political, regulatory or market conditions applicable to similar businesses in Korea)

- Certain specified actions in relation to KEB not occurring without the prior consent of HSBC Asia

- no material business restriction or suspension having been imposed on KEB as a result of the ongoing litigation in relation to the merger of the KEB Card business with KEB in 2004.

Within Korea, applications for approval will be made to the Financial Supervisory Commission and the Fair Trade Commission. In the event that the formal application for approval has not been submitted to the FSC on or before 31 January 2008, Lone Star has the right to terminate the acquisition agreement.

HOK-#537347-v2

2

EXHIBIT K-002

*Further due diligence*

Under the acquisition agreement, HSBC Asia has the right to conduct further due diligence on KEB in a period of 40 days following signing of the agreement, which may be extended by a further seven days in certain circumstances. HSBC Asia is then entitled, within five days of the end of that period, to notify Lone Star that it does not wish to proceed with the acquisition in which case the acquisition agreement will terminate.

*Consideration*

The consideration for the shares is KRW3,400 billion plus US$2,700 million amounting in total to the equivalent of approximately US$6,317 million, equivalent to KRW18,045 (US$19.20) per share, payable in cash, assuming the acquisition is completed on or before 31 January 2008. In the event that completion has not taken place on or before 31 January 2008, HSBC will pay a further US$133 million, equivalent to KRW380 (US$0.40) per share. The acquisition agreement is conditional on completion taking place on or before 30 April 2008. Settlement on closing will be made in cash in US Dollars, with the Korean Won element of the consideration converted into US Dollars at the then current exchange rate.

The consideration expressed in KRW at KRW18,045 per share represents a premium of 21.5 per cent to the share price as at 31 August 2007 of KRW14,850 per share, a 26.8 per cent premium to the 10 day average trading price to 31 August 2007 of KRW14,230 per share, a 29.0 per cent premium to the 30 day average trading price to 31 August 2007 of KRW13,990 per share and a multiple of KEB's stated book value at 30 June 2007 of 1.83 times.

The consideration payable will be offset by any dividends in respect of the shares subject to the acquisition paid by KEB by reference to a record date which is prior to the registration of HSBC Asia as a shareholder entitled to any such dividend.

The consideration was arrived at after arm's length negotiations between the parties. HSBC was advised by HSBC Corporate, Investment Banking and Markets and UBS AG acting through its business group, UBS Investment Bank. The Directors of HSBC believe the terms of the transaction are fair and reasonable and in the interests of HSBC's shareholders as a whole.

The acquisition will be financed from HSBC's own resources. Following completion, KEB will be accounted for as a subsidiary in HSBC's consolidated financial statements.

*Guarantee*

HSBC Asia will have the benefit of a guarantee from Lone Star Fund IV (US) LP and Lone Star Fund IV (Bermuda) LP guaranteeing the financial obligations of LSF-KEB Holdings SCA under the acquisition agreement.

*KEXIM*

KEXIM also owns 40,314,387 shares in KEB and, under the terms on which Lone Star originally invested in KEB, KEXIM has the right to require any purchaser of Lone Star's shares to acquire part or all of its shares on substantially the same terms. If this right is exercised in respect of all of KEXIM's shares, it would involve the payment by HSBC Asia of KRW727 billion (US$774 million) to KEXIM, assuming that completion takes place before 31 January 2008 and the consideration is set in Korean Won. If completion takes place after 31 January 2008, there will be a corresponding increase in the amount payable to KEXIM in line with the additional payment to Lone Star. Such purchase, if KEXIM exercises its right, would be conditional on, and completed at the same time as, completion of the purchase of Lone Star's KEB shares.

EXHIBIT K-003

*Management and operations*

Following completion and subject to relevant approvals, HSBC will be entitled to nominate a majority of directors to the Board of KEB including KEB's Chairman and Chief Executive and certain other officers. The KEB name will be retained with consideration being given to the addition, in a suitable form, of reference to KEB being a member of the HSBC Group to reflect its majority shareholding.

## INFORMATION ON KEB

KEB has over 5.4 million deposit customers and is the sixth largest bank in Korea, as measured by total assets at 30 June 2007. It has over 350 branches and a presence in 18 countries, making it Korea's leading international bank.

At 30 June 2007, KEB's total assets were KRW73.5 trillion (US$78.2 billion) with shareholders' equity of KRW6.3 trillion (US$6.7 billion). In the year ended 31 December 2006, KEB generated pre-tax profits of KRW1,482 billion (US$1,577 million) (2005: KRW1,654 billion (US$1,760 million)) and net income of KRW1,006 billion (US$1,070million) (2005: KRW1,934 billion (US$2,058 million)). Net income in the six months to 30 June 2007 was KRW516 billion (US$549 million). These results were prepared in accordance with Korean GAAP.

## REASONS FOR AND BENEFITS OF THE TRANSACTION

HSBC is one of the world's largest banking and financial institutions with an unparalleled international network across 83 countries and territories. The acquisition accords with HSBC's stated strategy of targeting investment at high growth markets with international connections and will further enhance the HSBC Group's footprint in the Asia-Pacific region.

HSBC believes that KEB would benefit from having a long-term, and internationally focused, strategic shareholder which would enable it to enhance future growth prospects. KEB has particular strengths in trade finance and foreign exchange, complementing HSBC's global capabilities in these areas. HSBC would also offer KEB the opportunity to add to the range of services it offers in other areas, from personal finance and credit cards to building deeper commercial and corporate relationships.

The importance of, and role played by, KEB in Korean international business, when linked with HSBC's broader global network will provide the leading platform to serve Korea's businesses and people internationally.

As a bank with a long history in Korea, and as the prospective majority shareholder in one of the nation's largest financial institutions, HSBC intends to make a full contribution to the further development of the financial services industry in Korea.

KEB's listing on the KRX will provide a continuing opportunity for Korean investors to participate in KEB's future.

*Financial rationale for transaction*

It is expected that the acquisition will be accretive to HSBC's earnings per share in its first full year of operations within the HSBC Group. HSBC has identified a number of areas of potential business growth for KEB as a member of the HSBC Group.

## GENERAL

*HSBC Holdings plc*

Headquartered in London, HSBC is one of the largest banking and financial services organisations in the world. Its international network comprises some 10,000 properties in 83 countries and territories in Europe; Hong Kong; rest of Asia-Pacific, including the Middle East

4
EXHIBIT K-004

and Africa; North America and Latin America. With listings on the London, Hong Kong, New York, Paris and Bermuda stock exchanges, shares in HSBC are held by about 200,000 shareholders in over 100 countries and territories. The shares are traded on the New York Stock Exchange in the form of American Depositary Shares. HSBC provides a comprehensive range of financial services to more than 125 million customers through four customer groups and global businesses: Personal Financial Services (including consumer finance); Commercial Banking; Corporate, Investment Banking and Markets; and Private Banking.

The Hongkong and Shanghai Banking Corporation Limited is an indirect, wholly-owned subsidiary of HSBC Holdings plc. HSBC Asia is a wholly-owned subsidiary of The Hongkong and Shanghai Banking Corporation Limited.

### Lone Star

LSF-KEB Holdings SCA is a Belgian incorporated holding company which holds 329,042,672 shares in KEB. It is controlled by the general partner of Lone Star Fund IV (US) LP, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Lone Star Funds is a family of private investment limited partnerships established to facilitate investment by a group of investors into financial and other assets.

### KEXIM

KEXIM is an official export credit agency owned by the Korean government providing comprehensive export credit and guarantee programs to support Korean enterprises in conducting overseas business.

### Miscellaneous

The acquisition constitutes a Class 2 transaction for HSBC under the Listing Rules of the UK Financial Services Authority and a discloseable transaction for HSBC under the Hong Kong Listing Rules. A circular containing further information on the transaction in accordance with the relevant requirements of the Hong Kong Listing Rules will be mailed to HSBC shareholders who have elected to receive corporate communications in printed form and will be available at the same time on HSBC's website, www.hsbc.com.

As at the date of this announcement, the Directors of HSBC are S K Green, The Baroness Dunn*, Sir Brian Moffat*, M F Geoghegan, Lord Butler*, J D Coombe†, R A Fairhead†, D J Flint, W K L Fung*, J W J Hughes-Hallett†, Sir Mark Moody-Stuart†, G Morgan†, S W Newton†, S M Robertson† and Sir Brian Williamson†.

* Non-executive Director
† Independent non-executive Director

To the best of the knowledge, information and belief of the Directors of HSBC having made all reasonable enquiries, both (a) Lone Star and its ultimate beneficial owners and (b) KEXIM and its ultimate beneficial owners are third parties independent of HSBC and its connected persons (as defined under the Hong Kong Listing Rules).

### Notes:

In this announcement:

(i)  "HSBC" means HSBC Holdings plc and its subsidiaries unless the context otherwise requires.

(ii) Figures in KRW have been translated into US$ at the rate of KRW939.9 = US$1 and figures in US$ have been translated into KRW at the rate of US$1 = KRW939.9 for indication purposes only.

HOK-#537347-v2

5

EXHIBIT K–005

(iii)   The financial figures for KEB for the years ended 31 December 2006 and 2005 have been extracted from the relevant audited accounts for KEB which were prepared on a consolidated basis.  The financial figures for KEB for the six months to 30 June 2007 have been extracted from the relevant unaudited interim accounts for KEB which were prepared on a non-consolidated basis.


By Order of the Board
R G Barber
Group Company Secretary

**HSBC Holdings plc**
*Incorporated in England with limited liability. Registered in England: number 617987*
*Registered Office and Group Head Office:*
8 Canada Square, London E14 5HQ, United Kingdom

3 September 2007

6
EXHIBIT K−006

# EXHIBIT L

FRB's Press Release Dated February 4, 1997

# FEDERAL RESERVE  press release



For immediate release                    February 4, 1997

     The Federal Reserve Board announced today the issuance of its Final Decision and Final Order of Prohibition and Assessment of Civil Money Penalty in the Matter of Ghaith R. Pharaon, a former BCCI insider.

     The Board assessed a $37 million fine against Pharaon, and permanently barred him from the U.S. banking industry due to his illegal activities.

     The Board's Final Decision adopted the Recommended Decision of the Administrative Law Judge who presided at a nineteen-day administrative hearing conducted in 1995 by attorneys from the Board and the Federal Reserve Bank of New York.

     The Board found that Pharaon acted illegally as a secret nominee for BCCI when he acquired the Independence Bank of Encino, California in 1985.

     The Independence Bank of Encino failed in January 1992.

     Pharaon, who is a resident of Saudi Arabia, is the subject of criminal indictments issued by the U.S. Department of Justice and the New York County District Attorney.  He participated in the Board's administrative hearing through his

EXHIBIT L-001

2

counsel, but has not returned to the United States to contest personally federal and state criminal charges.

Pharaon has the right to appeal the Board's Final Decision in a federal appellate court.

A copy of the Board's Final Decision, with the accompanying Order, is attached.

Attachment

EXHIBIT L—002

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**RECEIVED**
**AUG 10 2022**
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## I. (a) PLAINTIFFS
Wongu Ann

3-22-CV-1734-N

**DEFENDANTS**
Lone Star Fund IV (US), L.P.; Lone Star Global Acquisitions, Ltd.; and John P. Grayken

**(b)** County of Residence of First Listed Plaintiff  South Korea
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Dallas
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Proceeding pro se, a/o No Joon Park, 2512 Carroll Ct., Flower Mound, TX 75022, 972-672-7480

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | **PERSONAL INJURY** | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 310 Airplane | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 315 Airplane Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | | ☐ 485 Telephone Consumer Protection Act |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | **PERSONAL PROPERTY** | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 370 Other Fraud | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | ☐ 371 Truth in Lending | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | ☐ 380 Other Personal Property Damage | | | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 385 Property Damage Product Liability | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | **CIVIL RIGHTS** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 440 Other Civil Rights | **PRISONER PETITIONS** | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 240 Torts to Land | ☐ 441 Voting | **Habeas Corpus:** | | |
| ☐ 245 Tort Product Liability | ☐ 442 Employment | ☐ 463 Alien Detainee | | |
| ☐ 290 All Other Real Property | ☐ 443 Housing/ Accommodations | ☐ 510 Motions to Vacate Sentence | | |
| | ☐ 445 Amer. w/Disabilities - Employment | ☐ 530 General | | |
| | ☐ 446 Amer. w/Disabilities - Other | ☐ 535 Death Penalty | **IMMIGRATION** | |
| | ☐ 448 Education | **Other:** | ☐ 462 Naturalization Application | |
| | | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | |
| | | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §1332(a); 28 U.S.C. §2201
Brief description of cause:
Declaration regarding acquisition of a bank

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
N/A

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE _____ DOCKET NUMBER _____

DATE  August 8, 2022
SIGNATURE OF ATTORNEY OF RECORD  *ol 217* pro se

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

Wong u Am
c/o No Joon Park
2512 Carroll Ct
Flower Mound, Tx 75022





AUG 08 2022

To: United States District Court for
the Northern District of Texas
The Clerk of the Court
EarL Cabell Federal Buibling and United States Cour
1100 Commerce Street # 1452
Dallas, Texas 75242

AIR LOCK
TECHNOLOGY™
NYLON BARRIER SEAL
Holds Air Longer,
Protects Items Better.™

US POSTAGE PAID
$19.95
USPS RETAIL GROUND®

SHIP TO:
1100 COMMERCE ST
STE 1452
DALLAS TX 75242-1310

USPS TRACKING® #
9534 6103 8324 2220 9595 46